**In the Matter of Erica Denise MOORE, Debtor.**

**In the Matter of Maxine M. Daniels, Debtor.**

**Nos. 01–04380–TBB–13, 01–04010–TBB–13.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

March 25, 2003.

Kenneth Lay, Legal Services of Metro Birmingham, Inc., Birmingham, AL, for Debtors.

Bobby J. Hornsby, Law Offices of Bobby J. Hornsby and Associates, Birmingham, AL, for Farrington Apartments.

## MEMORANDUM OPINION

THOMAS B. BENNETT, Bankruptcy Judge.

### I. *The Universe*

Modification of the automatic stay of § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), with respect to two residential leases of real property, and each's assumability under § 365 of the Bankruptcy Code, 11 U.S.C. § 365, are subsets of the universe of facts and legal challenges raised in different Chapter 13 cases. One of the Chapter 13 cases involving one of the leases is that of Erica Denise Moore (hereinafter sometimes "Moore"). The other is that of Maxine M. Daniels (hereinafter sometimes "Daniels"). Also at issue is which of differing interpretations is proper, one which is federalistic in approach or another which is centralistic, for ascertaining whether a lease of residential real property ended under state law pre-bankruptcy is property of the estate under §§ 541(a) & 1306(a) of the Bankruptcy Code, 11 U.S.C. §§ 541(a) & 1306(a), which may be assumed under § 365(a) & (d) of the Bankruptcy Code, 11 U.S.C. § 365(a) & (d). The federalistic methodology looks to state law to ascertain what interests in property exist at the time of the commencement of a bankruptcy case. Then, whether property of the estate exists or not under 11 U.S.C. §§ 541(a) & 1306(a) is governed by these Bankruptcy Code sections. In contrast to this method of locating the existence of property of the estate,

the centralistic approach utilizes (i) variations of a statutory maxim, *expressio unius est exclusio alterius*, and a linguistic interpretative device, the plain meaning rule, coupled with (ii) interpretation of one or more of two non-property of the estate subsections of the Bankruptcy Code, 11 U.S.C. §§ 362(d)(10) & 365(c)(3), and one property of the estate excluding subpart of the Bankruptcy Code, 11 U.S.C. § 541(b)(2), and (iii) an analogy to a generalized rule for when a mortgagor loses the right to cure a default to conclude that a residential lease of real property terminated under state law before one's bankruptcy case is filed is property of the estate in a consumer-debtor's bankruptcy case. Essentially, the centralistic view for how one finds the existence of a residential lease of real property within 11 U.S.C. §§ 541(a) & 1306(a) is use of the Bankruptcy Code to modify in some cases the state law based determination of what property interests one possessed at the point when a bankruptcy case is started.

In both the Daniels and Moore cases, the pivotal legal issue is the existence or not of a residential lease of real property. What is not before this Court in either the Daniels or Moore matters is their continued entitlement to participate in the government rent subsidy program utilized to pay each's rent to a non-governmental entity, Farrington Apartments.

### II. *The Landscape*

Under the provisions of Title 24 of the Code of Federal Regulations, 24 C.F.R. §§ 880—891 (2001), the United States Department of Housing and Urban Development (hereinafter sometimes "HUD") pays subsidies, referred to as rent assistance, to landlords for qualified low income tenants who otherwise could not pay the full amount of the rent for a residential prop-

erty.[1] In each of the cases before this Court, a privately owned apartment is the rented residential property. Under HUD's regulations, the landlord of such privately owned properties is required to determine the income of the rent assisted tenant. It is the income level, among other factors, which is used to determine the portion of the rent to be paid by the tenant and the part subsidized by the United States. Farrington Apartments, the landlord in both cases, has just this type of subsidized rental arrangement with HUD regarding two of its tenants, Daniels and Moore.

One source for a landlord participating in HUD's assisted rent program, indeed the primary one in many cases, for obtaining income information regarding a tenant is from the tenant. It is the reliability of the source—rather, the lack thereof—which is a major, contributing cause of the landlord-tenant disputes involving Farrington Apartments, Daniels, and Moore.

### A. Daniels's Premises

On June 21, 2001, Maxine M. Daniels filed her bankruptcy petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301 et seq. Ms. Daniels has been a recipient of housing assistance under Section 8 of Title 24 of the Code of Federal Regulations, 24 C.F.R. § 882 (2001). She leased an apartment from Farrington Apartments for an initial period of one year commencing on August 1, 1997, and ending August 1, 1998. Unless terminated, the lease is automatically extended for successive terms of one year.

Based on what Maxine Daniels reported her income to be, the United States paid one hundred percent (100%) of her rent plus additional monies in the form of a monthly utility allowance. After commencement of her tenancy, Farrington Apartments discovered that Ms. Daniels had not accurately reported her income. It was greater than she disclosed.

Under the terms of the lease, Farrington Apartments is permitted to increase the portion of the rent paid by Ms. Daniels should her income increase or be greater than disclosed. The portion she could be required to pay is up to the full amount of the HUD approved market rate of rent. Despite her obligation to timely disclose the true amount of her income, Ms. Daniels did not. For the time during which she was not entitled to the amount of the subsidy received, Farrington Apartments recalculated the rent to be paid by Ms. Daniels and notified her that she owed rent retroactively for the period from March 1, 1999, through February, 2001, ("Retroactive Rent") based on newly discovered information which revealed the correct amount of her income for this period.

The Retroactive Rent was not paid. As a result, on April 3, 2001, Ms. Daniels received written notification that both the lease with Farrington Apartments and her tenancy rights thereunder were terminated for failure to pay the Retroactive Rent. The notice sets forth that the lease and the tenancy terminate ten days from its receipt and that the termination was based on her default in payment of rent. Although it does not specify that it is Retroactive Rent, this fact was known to Daniels and so was the fact that her not having previously paid any rent meant that the notice could only refer to the Retroactive Rent.[2] The notice also contains information

---

1. "The purpose of this program is to upgrade substandard rental housing and to provide rental subsidies for low-income families." 24 C.F.R. § 882.101(b) (2001).

2. Additionally, the Alabama Supreme Court has rejected the argument that failure to specify in the notice of termination which rent payments have not been paid makes the no-

required under the terms of the lease and HUD's regulations including her right to request and meet with representatives of Farrington Apartments before the effective date of the ending of the lease. So long as done according to the terms of the lease, which incorporates compliance with state law and HUD regulations, the ending of her lease and tenancy rights thereunder was effective on April 13, 2001. The Daniels–Farrington Apartments lease does not by any contract provision allow its reinstatement after termination by payment of accrued, unpaid rent.

Because Ms. Daniels remained in the apartment, Farrington Apartments filed an unlawful detainer action against her in the Circuit Court of Jefferson County, Alabama. After the date of termination of the lease and Ms. Daniels's tenancy and before entry of a final judgment in the unlawful detainer action, Ms. Daniels filed her Chapter 13 case. What she seeks and believes she can do through the bankruptcy process is forestall—indeed preclude—the effective termination of her lease, the loss of her asserted tenancy rights, and the ending of her presence in the apartment. She has also sought to assume the lease under § 365(a) & (d) of the Bankruptcy Code, 11 U.S.C. § 365(a) & (d). Farrington Apartments' rejoinder to this is its motion requesting relief from the automatic stay under § 362(d) of the Bankruptcy Code, 11 U.S.C. § 362(d), to enable it to go forward with the unlawful detainer suit in which it seeks her removal from the apartment by judicial process. Its stay modification motion is predicated on the assertion that the lease, Ms. Daniels's tenancy and her possessory rights arising under the lease—which are to be distinguished from her mere presence in and on the premises [3]—were ended before her bankruptcy filing.

### B. *Moore's Premises*

On July 5, 2001, Ms. Daniels's daughter, Erica Denise Moore, started her bankruptcy case under the provisions of Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301 *et seq.* Ms. Moore leased an apartment from Farrington Apartments employing the identical form of lease as that in the Daniels—Farrington Apartments transaction. The initial term of the lease was from March 1, 1997, to March 1, 1998. Unless terminated, the lease is automatically extended for successive terms of one year.

Just like her mother, Ms. Daniels received housing assistance through HUD's program under section 8 of Title 24 of the Code of Federal Regulations, 24 C.F.R. § 882 (2001). Based on her reported income, the United States paid all the rent for Ms. Moore's apartment and also paid her a monthly utility allowance. Identical to what Ms. Daniels had done, Farrington

---

tice ineffective or that it fails to meet any state statute or state contract law based notice of termination requirement. *Subway Real Estate Corp. v. Century Plaza Company,* 624 So.2d 1052, 1057 (Ala.1993) ("Subway, however, points to no requirement in the Lease, Amended Lease, or Alabama law that requires Century to specify the exact payments alleged to be delinquent as a condition precedent to reentry and forfeiture. Therefore, this argument is without merit.").

**3.** The important distinction is the *source* of the basis for possession of the property. If the leasehold estate has not ended, one's presence on the leased property, that is possession, is one of the bundle of property interests acquired under the lease. If the leasehold estate is ended, any possessory interest to the real property normally does not arise from a lease agreement. Failure to recognize this distinction convolutes the analysis of whether one has a leasehold estate interest just because of one's presence on property which, for a no longer existing leasehold interest, has to arise from a source other than a previously existing lease and leasehold estate.

Apartments discovered that Ms. Moore had not reported the full amount of her income for portions of the time she received government rental assistance. Therefore and pursuant to the provisions of the lease, Farrington Apartments exercised its right to increase Ms. Moore's rent for the periods during which Ms. Moore inaccurately reported her income. The outcome was that Ms. Moore was required to pay Retroactive Rent for the period of July 1, 2000, through February, 2001.

She did not pay the Retroactive Rent and on April 3, 2001, she was tendered notice that her lease was terminated. It disclosed that the effective date of termination of her lease and tenancy would be ten days from receipt of the notice. This meant that, if done according to the lease provision and applicable laws and HUD regulations, on April 13, 2001, her lease and tenancy rights thereunder were ended. The notice of termination also sets forth that the reason for termination was her default in payment of rent. It does not specifically identify the unpaid rent as being the Retroactive Rent. However and similar to the facts involving Daniels, Moore knew that the notice referred to the Retroactive Rent for, among other factors, she had not paid rent in the past and was aware of the recalculation of rent following discovery of her correct income. As that given Ms. Daniels, the notice of termination also contained the disclosures required by the lease and HUD's regulations such as Ms. Moore's right to meet with the landlord regarding the basis for termination and her right to institute legal proceedings. Additionally and unlike some residential leases, Moore's does not contain a contract provision allowing reinstatement of the lease following termination on the post-termination payment of accrued, unpaid rent and its acceptance by the landlord.

Exactly as her mother had done, Ms. Moore did not vacate her apartment by the April 13, 2001, ending date of the lease and her tenancy rights. This resulted in Farrington Apartments filing an unlawful detainer action against Ms. Moore in the Circuit Court of Jefferson County, Alabama.

Before entry of a final judgment in the unlawful detainer action, Ms. Moore filed her bankruptcy petition. Again and as with Ms. Daniels, the primary purpose of commencing her bankruptcy case has been to enable Ms. Moore to retain the apartment by attempting to assume the lease under § 365(a) & (d) of the Bankruptcy Code, 11 U.S.C. § 365(a) & (d), in conjunction with her hoped to be confirmed Chapter 13 plan. As it did with Ms. Daniels, Farrington Apartments has responded to Ms. Moore's bankruptcy tactic by seeking modification of the automatic stay imposed under § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), to enable it to have Ms. Moore removed from the apartment via the state court unlawful detainer process. Farrington Apartments argues that Ms. Moore's landlord-tenant relationship with it and any lawful tenancy in and right of possession of the apartment were no longer in existence as of the filing of her bankruptcy case.

As is evident, the identical legal issues are presented to this Court with respect to each of the stay modification motions filed by Farrington Apartments and Ms. Daniels's and Ms. Moore's responses to the respectively applicable motion. Also, no material or relevant fact differences exist between the cases of Ms. Daniels and Ms. Moore. It is due to the sameness of the legal issues and of the relevant and material facts that this Court addresses in this opinion each of Farrington Apartments' motions and the Daniels–Moore rejoinders.

### III. *Legal Terrain—Overview*

### A. *Property of the Estate—National in Approach, Yet Federalism Incorporated*

#### (1) *The Set Denominated Property of the Estate*

##### (a) *Statutes*

Under § 1306(a) of the Bankruptcy Code, 11 U.S.C. § 1306(a), property of a debtor's Chapter 13 estate is defined to include property interests a debtor holds at the time his/her case is filed, accretions and proceeds from such property after the filing of the bankruptcy case plus certain post-petition acquired property. Its wording is:

> (a) Property of the estate includes, in addition to the property specified in section 541 of this title
>
> > (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first; and
> >
> > (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

11 U.S.C. § 1306(a). Much the same as § 1306(a), 11 U.S.C. § 541(a) delineates property within the perimeters of "property of the estate." Included within the set denominated "property of the estate" are interests existing as of filing a debtor's case, 11 U.S.C. § 541(a)(1) & (2), those recovered by or preserved for the estate, 11 U.S.C. § 541(a)(3) & (4), others acquired after filing of the bankruptcy case, 11 U.S.C. § 541(a)(5) & (7), and property received after filing which has as its sources property of the estate, 11 U.S.C. § 541(a)(6). Section 541(b) lists interests categorized as outside § 541(a)'s set's perimeters, and § 541(c)(2) & (d) detail limitations on the extent to which certain interests are within the set of "property of the estate." 11 U.S.C. § 541(c)(2) & (d).

In the context of these Moore–Daniels–Farrington Apartments matters, the consequence of § 1306(a)'s language, coupled with that of 11 U.S.C. § 541, is that 11 U.S.C. § 541(a) is the operative subpart of the "property of the estate" section for determining the interests in property of Moore and Daniels which became property of each's bankruptcy estate as of each's respective filing of a bankruptcy case. What is set forth is this:

> (a) The commencement of a case under section 301, 302, 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> > (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> \* \* \* \* \* \*

11 U.S.C. § 541(a)(1).

##### (b) *Nonuniform Uniformity— Constitution, Case Law & Federalistic Structure*

Although under the Uniformity Clause of Art. I, § 8 of the Constitution, laws on bankruptcy including the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, are to be uniform, Congress is permitted in certain instances to recognize differing laws of the various states even though this may not lead to identical outcomes in bankruptcy cases arising in the different subjurisdictions comprising the United States. While discussing the Bankruptcy Act, the Supreme Court espoused just when the uni-

formity requirement for bankruptcy laws mandates a centralistic application—one with unvarying nationwide application—and when a federalistic structure is permitted, i.e., one where state laws are used to determine, at least in part, that which the national law governs:

The Federal Constitution, Article I, § 8, gives Congress the power to establish uniform laws on the subject of bankruptcy throughout the United States. In view of this grant of authority to the Congress it has been settled from an early date that state laws to the extent that they conflict with the laws of Congress, enacted under its constitutional authority, on the subject of bankruptcies are suspended. While this is true, state laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress. *Sturges v. Crowninshield,* 4 Wheat. 122, 4 L.Ed. 529 [(1819)]; *Ogden v. Saunders,* 12 Wheat. 213, 6 L.Ed. 606 [(1827)].

Notwithstanding this requirement as to uniformity the bankruptcy acts of Congress may recognize the laws of the state in certain particulars, although such recognition may lead to different results in different States. For example, the Bankruptcy Act recognizes and enforces the laws of the states affecting dower, exemptions, the validity of mortgages, priorities of payment and the like. Such recognition in the application of state laws does not affect the constitutionality of the Bankruptcy Act, although in these particulars the operation of the act is not alike in all the states.

*Stellwagen v. Clum,* 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507 [(1918)].

*Butner v. U.S.,* 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 917–918 n. 9, 59 L.Ed.2d 136, 141 n. 9 (1979). One area where this use of different state laws for national bankruptcy law purposes has occurred is in determining what is property of the estate under § 541 of the Bankruptcy Code, 11 U.S.C. § 541. See, e.g., *Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39, 46 (1992); *Butner,* 440 U.S. at 54–55 & n. 9, 99 S.Ct. at 917–918 & n. 9, 59 L.Ed.2d at 141–142 & n. 9.

■ As part of fathoming what is property of the estate, courts have fashioned guiding precepts. Section 541(a)(1)'s "all legal and equitable interests of the debtor in property as of the commencement of the case" is broadly construed. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515, 521–22 (1983); *In re Thomas,* 883 F.2d 991, 995 (11th Cir.1989).[4] Along with this standard there are correlative principles for determining property of the estate. One is that § 541(a) does not expand the property interests of a debtor beyond those held at the moment a bankruptcy case is started. See, e.g., *Thomas,* 883 F.2d at 995; *In re Jones,* 768 F.2d 923, 927 (7th Cir.1985); *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1213 (7th Cir.1984). Another is what is property of the estate for purposes of bankruptcy laws—in these Moore–Daniels cases the Bankruptcy Code—is a question of federal law while what property interest Moore and Daniels possessed at the commencement of a bank-

---

**4.** *Whiting Pools* is cited for the concept that § 541(a)(1)'s all legal and equitable interests is interpreted broadly. It is not cited for its holding regarding the specific property interest(s) determined to exist about which there is a simmering debate over the correctness of the Supreme Court's conclusion. See Thom-

as E. Plank, *The Creditor in Possession Under the Bankruptcy Code: History, Text, and Policy,* 59 Md. L.Rev. 253, 254, 318–19 (2000); Thomas E. Plank, *The Outer Boundaries of the Bankruptcy Estate,* 47 Emory L.J. 1193, 1234–58 (1998).

ruptcy case are, absent a controlling federal law to the contrary, created and defined by state law. *Barnhill,* 503 U.S. at 398, 112 S.Ct. at 1389, 118 L.Ed.2d at 46 ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *Butner,* 440 U.S. at 54, 99 S.Ct. at 918, 59 L.Ed.2d at 141–42 ("Congress has generally left the determination of property rights in the assets of a bankruptcy's estate to state law."); *In re Reed,* 940 F.2d 1317, 1322 (9th Cir.1991); *In re Atchison,* 925 F.2d 209, 210–11 (7th Cir.1991); *Thomas,* 883 F.2d at 995; *In re Detlefsen,* 610 F.2d 512, 515 (8th Cir.1979).

It is these longstanding property of the estate concepts—those used to find just what property one holds as of the cleavage point marked by the moment one files bankruptcy and which of these interests become property of a bankruptcy estate— which reveal that when it comes to deciding what interests in property a debtor possesses for purposes of § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a), the structure of this portion of the Bankruptcy Code is federalistic in nature. It is due to this federalistic structure that one must resort to state law, here Alabama's, in conjunction with the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* to resolve whether Moore or Daniels held, as of the initiating of each's bankruptcy case, any property interests constituting an unexpired lease of nonresidential real property within 11 U.S.C. § 541(a) and, as a result, also included with 11 U.S.C. § 1306(a).

### B. *The Compounding—Issues and Analytical Process*

Although one's reading of the applicable Alabama statutes governing lease terminations and the decisions of Alabama's courts regarding lease and tenancy endings should lead the reader to conclude that the status of the Moore lease and the Daniels lease with Farrington Apartments was evident as of April 13, 2001, other decisions by federal courts necessitate a broader analysis of the interplay of state law with the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* The result is that the analysis of the Moore–Daniels–Farrington Apartments contentions entails consideration of legal issues which may be divided into three categories. The first involves a determination under Alabama law of the station of each lease, in existence or ended, and what the tenancy/possessory rights of Ms. Moore and Ms. Daniels were as of the time each filed her bankruptcy petition.

Next is finding just what property interests recognized by the national law of bankruptcy Moore had and, alternatively, Daniels had under §§ 541(a), 1306(a) of the Bankruptcy Code, 11 U.S.C. §§ 541(a), 1306(a), which is property of, respectively, the Moore bankruptcy estate and that of Daniels. More specifically and due to the pre-bankruptcy terminations of the leases, whether the presence of Ms. Moore and Ms. Daniels in each's respective apartment on the commencement of each's bankruptcy case gives either of them the kind, quality, and quantity of property interests which are sufficient to constitute an unexpired residential lease of real property within § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a), which may be assumed in a Chapter 13 case under 11 U.S.C. § 365(a) & (d)(2).

The third grouping of legal issues for consideration is comprised of three ways by which some federal courts find the existence of an unexpired lease of residential real property despite state law recognizing the same lease and leasehold estate as having ended pre-bankruptcy. One is the holdings of federal courts which interpret one or more of § 362(b)(10), § 365(c)(3) & (d)(2), and § 541(b)(2) of the Bankruptcy Code, 11 U.S.C. §§ 362(b)(10), 365(c)(3) & (d)(2), and 541(b)(2), as showing that a pre-

bankruptcy terminated residential real property lease is property of a bankruptcy estate constituting an unexpired lease for assumption purposes under 11 U.S.C. § 365. As is demonstrated later, those courts which have used one or more of 11 U.S.C. §§ 362(b)(10), 365(c) & (d)(2), and 541(b)(2) as a method to cause the boundaries of the set of "property of the estate" to encompass residential real property leases terminated under state law prebankruptcy advance a centralistic structure for determining the existence of property interests for property of the estate provisions of §§ 541(a), 1306(a) of the Bankruptcy Code, 11 U.S.C. §§ 541(a), 1306(a). Additionally, a generalized rule for all residential real property leases is adopted by use of an analogy to residential mortgage default curing in Chapter 13 cases plus use of post-termination state lease antiforfeiture remedies as simply the curing of a default. This centralistic approach makes certain non-property of the estate sections of the Bankruptcy Code control over the law of the constituent states to create and define what residential real property interests a debtor possesses as of the commencement of a bankruptcy case regardless of how the identical determination would be made under the federalistic structure which allows state law to fix what property and interests in property a bankrupt debtor holds at the beginning of a bankruptcy case. Lastly, certain of the cases using a centralistic approach also urge miscellaneous legal arguments to justify assumption of residential leases in Chapter 13 cases based on *In re Fontainebleau Hotel,* 515 F.2d 913 (5th Cir.1975), to the effect that (i) Louisiana law is identical to Alabama's on lease endings and is, therefore, authority for Alabama lease endings, and (ii) a federal general equity based policy utilized by the *Fontainebleau Hotel* court should be adopted for purpose of residential lease assumptions in Chapter 13 cases.

IV. *Alabama Law—Existing or Not, The State's Domain*

A. *The Statutory and Case Law Structure—Complying with Both*

(1) *Statutes and Applicability*

To determine whether a leasehold interest has been terminated under Alabama law, one must ascertain into which legal classification the lease fits. For the ending of express leases—not those implied by law, Alabama has five classifications. Four are set forth in Title 35, Chapter 9 of the Alabama Code and one is discussed in the opinions of Alabama's courts and is based on the contractual agreement.

In Alabama, there is no statutory distinction under the relevant code sections between residential and nonresidential leases. See Ala.Code §§ 35–9–1 *et seq.* (1991). This makes the statutes governing residential leases the same as those for nonresidential. One of the statutory classes is for leases for tenancies at will, or for which no time is specified for the end of the tenancy, Ala.Code § 35–9–3 (1991), a second is for leases with a month to month term or for a term of less than one year, Ala.Code § 35–9–5 (1991), the third is for leases terminated for breach of or a default under the provisions of the lease, Ala.Code § 35–9–6 (1991), and a fourth is for tenancies for a certain term and the term runs to its stated end, Ala.Code § 35–9–8 (1991). The fifth classification is not statutory and is for leases which by the terms of the contract specify as a default certain failures by a lessee to perform, make such defaults a basis to end or forfeit the lease, and/or grant a right of reentry to the landlord with or without the necessity of any (a) notice of termination or (b) physical retaking of the property,

i.e., physical re-entry. See, e.g., *Moriarty v. Dziak,* 435 So.2d 35, 36–37 (Ala.1983); *Garrett v. Reid,* 244 Ala. 254, 256, 13 So.2d 97, 97–99 (1943); *First Nat'l. Bank of Huntsville v. Carter,* 231 Ala. 268, 164 So. 388 (1935); *Myles v. Strange,* 226 Ala. 49, 145 So. 313 (1932); *Johnson v. Blocton–Cahaba Coal Co.,* 205 Ala. 373, 374, 87 So. 559, 561 (1921); *Princess Amusement Co. v. Smith,* 174 Ala. 342, 343–44, 56 So. 979, 980 (1911).

For leases having a tenancy for which no ending point is set forth in the contract document, the lease is treated under Ala. Code § 35–9–3 (1991) as one from December 1 to December 1.[5] In other words, the lease would end on the December 1 following the commencement of the lease term. Where a lease is expressly at will, the lease may be terminated by either the lessor or lessee at will by giving ten (10) days written notification. Ala.Code § 35–9–3 (1991).[6]

Similar to the treatment of tenancies at will under Ala.Code § 35–9–3 (1991), Ala. Code § 35–9–5 (1991) specifies the ending of tenancies for month to month leases and leases for less than one year.[7] This section allows termination of the tenancy of

one who does not have an agreement to holdover or stay on the premises by the giving of ten (10) days written notice of the termination. It also provides that the lessor/landlord may—*not must*—recover possession of the rented property by use of an unlawful detainer action. Ala.Code § 35–9–5 (1991).[8]

Unlike the treatment of other tenancies, Alabama's statute for leases involving a tenancy for a certain, fixed period which conclude by the lapse of such a term, e.g., a sixteen month lease ends at the end of sixteen months, requires the lessee to surrender possession of the leased property. No notification of the end of the tenancy or a demand for return of the leased property need be made of the lessee.[9] Ala.Code § 35–9–8 (1991).

Neither Ala.Code § 35–9–3 (1991), Ala. Code § 35–9–5 (1991), nor Ala.Code § 35–9–8 (1991) are applicable to the Daniels or Moore leases. This is due to the fact that these govern the termination of leases and the possessory right thereunder when either the term of the lease has concluded by running to the end of the stated term or, but for the giving of the statutory

---

5. "Where no time is specified for the termination of tenancy, the law construes it to be from December 1 to December 1 but if it is expressly a tenancy at will, then either party may terminate it at will, by 10 days' notice in writing." Ala.Code § 35–9–3 (1991).

6. Other remedies recognized in Alabama include ejectment, Ala.Code § 6–6–280 (1991), peaceful self-help reentry, see *Moriarty v. Dziak,* 435 So.2d 35, 36–37 (Ala.1983); *Princess Amusement Co. v. Smith,* 174 Ala. 342, 343–44, 56 So. 979, 980 (1911); and injunctive relief.

7. "In all cases of tenancy by the month or for any other term less than one year, where the tenant holds over without special agreement, the landlord shall have the right to terminate the tenancy by giving the tenant 10 days' notice in writing of such termination, and the

landlord upon giving said notice for said time shall be authorized without further notice to the tenant to recover possession of the rented premises in an action of unlawful detainer." Ala.Code § 35–9–5 (1991).

8. Ala.Code § 6–6–316 (1991) specifies that: "No proceedings had under this article [forcible entry and unlawful detainer] or judgment entered bars or prevents the party injured from prosecuting an action of trespass or other action against the aggressor or party offending."

9. "When a tenancy is for a certain period, and the term expires by the terms of the lease, the tenant is then bound to surrender possession, and no notice to quit or demand of possession is necessary." Ala.Code § 35–9–8 (1991).

method of notice of termination, would otherwise either renew for a term equal to the original term, e.g., week-to-week, month-to-month etc., for up to less than one year, or continue on an at will basis. None of these is what occurred with Daniels and Moore.

(2) *Termination Meeting Statutory and Contract Requirements—No Resolution of Retaking of Premises Necessary*

As the subsequent scrutiny will highlight, no discussion of Alabama's lease termination statutes would be required if the leases at issue contained only the indispensable provisions for termination without their complicating language referencing having termination of the leases carried out in accordance with the provisions of the lease, applicable state law, and HUD regulations. Because the language of the lease with Daniels and the other with Moore is cobbled from HUD regulations, Alabama's statutes governing lease terminations, and similar Alabama case law dealing with lease endings, it is susceptible of being interpreted as mandating compliance with both the contract termination requirements and those of the only applicable Alabama statute, Ala.Code § 35–9–6 (1991). Since the resolution of these landlord-tenant disputes is not changed by deciding the parties' positions as if compliance with both the contract provisions and Ala.Code § 35–9–6 (1991) is required, this Court avoids resolution of this contract construing issue by deciding the Daniels–Moore–Farrington Apart-

ments disputes as if both the contract and Alabama statutory preconditions to termination had to be met. Furthermore and as will become evident, all this Court need determine under Alabama law is whether each of the leases at issue ended pre-bankruptcy. If so ended and with the exception of whether the stay imposed under 11 U.S.C. § 362(a) should be modified to permit Farrington Apartments to exercise one or more of its state law remedies to obtain possession of the apartments, no resolution by this Court in this case is warranted regarding retaking of possession of the leased premises by the landlord by use of Alabama's unlawful detainer statute or otherwise. Likewise and since no valid argument has been presented that the prerequisites to termination under the applicable HUD regulations have not been followed, this Court need only consider whether terminations of the leases was done in accord with the terms of each lease and Alabama's laws.[10]

(3) *A Leasehold or Not—Alabama's Position and That of Moore and Daniels*

Ala.Code § 35–9–6 (1991) governs the ending of a lease and a lessee's possessory rights thereunder for a breach of or default under the terms of the lease. It specifies that to terminate a lease for a breach or default "... it shall not be necessary to give more than 10 days notice to quit, *or of the termination of such tenancy* ..." (emphasis added).[11] This section is

**10.** Moore argues that the real reason for termination of her lease was failure to truthfully disclose her income, not her failure to pay rent. Daniels makes the same argument. Each contends this had to be the reason for termination and failure to use it precluded termination under HUD's regulations. This Court disagrees. Each lease provision for increasing rent and seeking payment of the retroactive rent was properly followed by Farrington Apartments. Thus, the use of non-

payment of rent was an alternate basis for termination on which it could rely. See text discussion *infra.*

**11.** "When default is made in any of the terms of a lease, it shall not be necessary to give more than 10 days' notice to quit, or of the termination of such tenancy, and the same may be terminated on giving such notice to quit at any time after such default in any of

clear that the lease is ended, in statutory parlance terminated, following the giving of proper notice of termination: "... the same may be terminated on the giving of such notice [no more than ten days] ... any time after such default." Ala.Code § 35–9–6 (1991). This section also provides for giving notice or demand to the lessee to leave the leased property and that "... no other notice or demand of possession or termination of such tenancy shall be necessary to maintain unlawful detainer." Similar to this statutorily prescribed notice of termination is that specified in the Moore lease and that of Daniels with Farrington Apartments. It is to be notice in advance of no less than ten days commencing with service of the notice of termination.[12]

■■■■ For Alabama law purposes, the inquiry in these Farrington Apartments— Moore and Farrington Apartments—Daniels disputes is whether (i) the breaches or defaults relied upon are of the type upon which a termination under Alabama case law and Ala.Code § 35–9–6 (1991) may be premised, and (ii) the leases' and Alabama's statutory procedure to terminate were followed. Alabama has not by statute or under its common law allowed a breach or default under a lease for failure to pay rent to be a statutorily premised basis for termination of a lease or for re-entry of the leased property. See *Kennamer Shopping Center, Inc. v. Bi–Low*

*Foods, Inc.*, 571 So.2d 299, 300 (Ala.1990); *Pieper v. American Sign/Outdoor Advertising, Inc.*, 564 So.2d 49, 50 (Ala.1990) (No right to terminate lease and re-enter leased property for nonpayment of rent unless lease so provides.); *City of Birmingham v. Link Carnival, Inc.*, 514 So.2d 792 (Ala.1987); *Ferguson v. Callahan*, 262 Ala. 117, 118, 76 So.2d 856, 857 (1955); *Myles*, 226 Ala. at 50, 145 So. at 313. Although in *Kennamer* the lease was for a term certain and it allowed the lessee to end the tenancy on giving written notice of termination sixty days in advance of the effective date, it did not contain language making a lessee's payment default the basis for terminating the lease or granting a right of re-entry to the lessor. The Supreme Court of Alabama held that Ala. Code § 35–9–6 (1991)

> ... does not, of itself, provide an independent right of re-entry or power of termination of the leasehold agreement. No such right or power exists upon default in the absence of a provision therefore in the agreement itself.... More specifically, this Court has long held that the non-payment of rent does not constitute a statutory default giving rise to a right of re-entry or power of termination independent of covenants in the lease.

*Kennamer*, 571 So.2d at 300 (citations omitted). Despite this, Alabama law recognizes and its courts enforce contractual agreements making nonpayment of rent a

---

the terms of such lease; which notice may be substantially in the following form:
'To A. B.:
You are hereby notified that in consequence of your default in (here insert the character of the default) of the premises now occupied by you, being (here describe the premises), I have elected to terminate your lease, and you are hereby notified to quit and deliver up possession of the same to me within 10 days of this date. Dated this ...... day of ........................' To be signed by the lessor or his agent; and no other notice or

demand of possession or termination of such tenancy shall be necessary to maintain unlawful detainer." Ala.Code § 35–9–6 (1991).

**12.** 24 C.F.R. § 880.607 is the HUD regulation governing the termination of the type of subsidized arrangements involving Moore, Daniels, and Farrington Apartments. It specifies that for material noncompliance under a lease, the time of service of the termination notice "... must be in accord with the lease and state law." 24 C.F.R. § 880.607(c)(2) (2002).

default upon which a lessor may predicate termination of a lease and re-entry of the leased premises. See *Kennamer Shopping Center, Inc.,* 571 So.2d at 300; *Ferguson,* 262 Ala. at 118, 76 So.2d at 857; *Myles,* 226 Ala. at 50, 145 So. at 314.[13]

■ In these Moore—Daniels—Farrington Apartments matters, each of the leases contains this language:

¶ 16. Reporting Changes Between Regularly Scheduled Recertifications:

a. If any of the following changes occur, the Tenant agrees to advise the landlord immediately.

\* \* \* \* \* \*

(3) The household's income cumulatively increases by $40 or more a month.

\* \* \* \* \* \*

c. If the Tenant does not advise the Landlord of these interim changes, the landlord may increase the Tenant's rent to the HUD-approved market rent.

\* \* \* \* \* \*

The lease entered into by Ms. Moore and that by Ms. Daniels required that each disclose an increase in household income of $40.00 or more per month. It is undisputed that such an income increase occurred and that neither Ms. Moore nor Ms. Daniels complied with the lease income reporting requirement.

Coupled with its ability to increase rent to the HUD approved market rate under paragraph 16c of each lease, paragraph 18 of each lease imposes a tenant repayment obligation:

... or does not report interim changes in family income or other factors as required by paragraph 16 of this Agreement, and as a result, is charged a rent less than the amount required by HUD's rent formulas, the Tenant agrees to reimburse the Landlord for the difference between the rent he/she should have paid and the rent he/she was charged....

This is what Farrington Apartments did. It assessed Erica Moore $2,176.00 in rent following the paragraph 18 recalculation and in like manner determined Ms. Daniels owed $1,464.00 as added rent which should have been paid if the proper state of her household income had been divulged.

Of crucial significance to resolution of whether the leasehold interests and tenancy rights of Ms. Moore and Ms. Daniels were, in fact, terminated under Alabama law is the language set forth in paragraph 23 of each lease which is the portion governing termination of tenancy. Paragraph 23b specifies that Farrington Apartments may terminate the

... Agreement only for:

(1) the Tenant's material noncompliance with the terms of this agreement [ ]

\* \* \* \* \* \*

Later in paragraph 23, material noncompliance is defined to include, among other things, "... non-payment of rent ... due

---

13. To understand why this is so necessitates delving into the untrowable realm of real property law. In Alabama, a lease is viewed as having two distinct aspects. It is both a contract and a conveyance of an estate. Joined with this is that Alabama treats covenants in a lease as independent. This means that although nonpayment of rent or other required lease payment may be a default vis-a-vis the contract, it is not treated as a default with respect to the estate conveyed, the tenant's possessory rights, unless the lease expressly makes nonpayment a basis for ending the tenants possessory right. Jesse P. Evans III, *Alabama Property Rights and Remedies,* § 21.5(b)(i) (2d ed.1998).

under the lease beyond the grace period permitted under State law."

Ms. Moore and Ms. Daniels concede that they did not make the contractually mandated disclosure of an increase in household income, received notice of the additional rent due for the period during which each did not disclose the increase in household income, and have never paid the assessed, additional rent. As a consequence of this state of affairs, each was in material noncompliance with the terms of the respective lease agreements and Farrington Apartments had the contractual right to terminate the lease and tenancy of Ms. Moore and that of Ms. Daniels. This it did for each effective on April 13, 2001.

As already indicated, the agreement by Moore and that by Daniels making by contract nonpayment of rent a basis for termination of a lease, and of the tenancy thereunder, is recognized and enforced by Alabama's courts. See *Kennamer Shopping Center, Inc.*, 571 So.2d at 300; *Lynaum Funeral Home, Inc. v. Hodge*, 576 So.2d 169, 170–71 (Ala.1991). Given the explicit language making nonpayment of rent a default and a basis for termination of the Daniels lease and the Moore lease, such a default is also one on which Ala. Code § 35–9–6 (1991) may be used to end each lease. *Kennamer Shopping Center, Inc.*, 571 So.2d 299; *Pieper*, 564 So.2d 49; *Link Carnival, Inc.*, 514 So.2d 792; *Ferguson*, 262 Ala. 117, 76 So.2d 856; *Myles v. Strange*, 226 Ala. 49, 145 So. 313 (1932). The result is that the basis for each of the terminations is proper and enforceable under the respective leases and Alabama's laws.

At this juncture for Alabama law purposes, it remains to be decided whether Farrington Apartments procedurally implemented termination of the lease with Ms. Moore and that with Ms. Daniels consistent with what each lease and Alabama's statute require. With respect to Ms. Daniels, a written notice of termination of lease, signed on behalf of Farrington Apartments, dated and addressed to her, was served on her at the leased premises on April 3, 2001. It specified consistent with the terms of the lease that the termination was for default in payment of rent for "April, 1999, to present" and that the lease was terminated ten (10) days from receipt of the notice. For Ms. Moore, a similarly signed, dated, and addressed notice of termination was served on her at the leased premises on the same day as Ms. Daniels's notice with the identical ten (10) days prior notice of the effective date. The basis of the termination was nonpayment of rent for July, 2000, to March 1, 2001. Both notices were served in a manner allowed under the contract provisions and the propriety of the method of service has not been challenged. For Ms. Moore and Ms. Daniels, the procedure followed for termination of the leases and leasehold estates was in accord with the requirements of the lease provisions.

The same is true for the procedural requirements of Ala.Code § 35–9–6 (1991). They have been met for each of the leases. Farrington Apartments gave the statutorily required notice of termination in a proper form, manner, and content. The ten (10) days advance notice of the effective date of termination is more than the minimum which is required by Ala.Code § 35–9–6 (1991). In fact, Alabama's Supreme Court has enforced a residential lease provision which made termination of the lease and possessory interest under the lease "immediately" on giving of such notice. *Johnson v. Blocton–Cahaba Coal Co.*, 205 Ala. 373, 376, 87 So. 559, 562 (1921).

Since the breach or default relied on by Farrington Apartments is within the scope of and proper notice of termination having been given under the contract provisions

and Ala.Code § 35–9–6 (1991), the Alabama's courts' holdings on the impact of such a status are consistent: the tenant has no leasehold estate and no lawful right under any consensual agreement with a lessor to be on or to use the formerly leased property. See *Kennamer Shopping Center, Inc.*, 571 So.2d 299; *Pieper*, 564 So.2d 49; *Link Carnival, Inc.*, 514 So.2d 792; *Jones v. Duncan*, 250 Ala. 587, 35 So.2d 345 (1948); *Blocton–Cahaba Coal Co.*, 205 Ala. 373, 87 So. 559 (residential lease termination). As the Supreme Court of Alabama set forth in *Jones v. Duncan* describing the predecessor to Alabama Code § 35–9–5 (1991):

> The purpose of the notice provided for in section 5, Title 31, Code, is not to require the tenant or lessee to do any act. Its purpose is to change his status in relation to the landlord or lessor, and to terminate his existing lease and possessory right thereunder.

*Jones v. Duncan*, 250 Ala. at 589, 35 So.2d at 347.

The implication is self-evident. Ms. Moore's lease with Farrington Apartments and her estate in the leased premises ended on April 13, 2001. The same applies to Ms. Daniels's lease and leasehold estate. From April 13, 2001, Ms. Moore and Ms. Daniels had no lease for an apartment with Farrington Apartments, no right of tenancy under a lease, and no leasehold estate on which to premise possession of the respective apartments. Daniels and Moore have simply remained in the respective apartments for which they no longer had under Alabama's laws any lawful right to occupy or possess. See *Lane v. Henderson*, 232 Ala. 122, 123–24, 167 So. 270, 271 (1936); *Blocton–Cahaba Coal Co.*, 205 Ala. at 376, 87 So. at 562 (After termination of a residential lease, notice to quit under then existing version of unlawful detainer statute, Ala.Code 1907 § 4263,

"... gave defendant no possessory right ... to remain on the premises longer than the 10 days provided by the ..." statute. In 1996, the ten day unlawful detainer statutory period to quit the premises was eliminated resulting in no such statutory justification, if it ever was one, for remaining on a premise after termination. Ala. Code § 6–6–310(2) (1991).).

What is perceptible is that any deconstruction of the meaning of Alabama's statutes governing the ending of leases, its courts' interpretations of them, or of Alabama's courts' enforcement of terminations of leases following giving of the notice of termination in the proper form, by the proper manner, and predicated on a default made a basis for ending a lease by the terms of the lease is not supported by Alabama's statutes, its courts' interpretations of them, or Alabama's courts' enforcement of contract terms ending leases for nonpayment of rent. Since the April 13, 2001, effective date of termination of each of the leases with Farrington Apartments preceded the bankruptcy filings by Ms. Moore and Ms. Daniels, the result has been that Ms. Moore and Ms. Daniels had no residential real property leasehold interest under Alabama's laws as of the institution of each's bankruptcy case which could become property of the estate under 11 U.S.C. §§ 541(a), 1306(a). More directly and although each occupied a residential real property on the filing of bankruptcy, the source of their occupancy rights and possession of the residential real property was, as of the date of each's respective bankruptcy filing, not from a lease and did not constitute a leasehold estate.

#### (4) *Relief or Not—The Antiforfeiture Progression*

Although for many Alabama leasehold interests the discussion of the existence or not of a residential real property interest under Alabama law might end at this

point, other bankruptcy case law which uses subparts of the Bankruptcy Code to redefine the scope of property interests beyond that provided for under state law requires a further consideration of Alabama law. It is an area of law not addressed by Moore, Daniels, or Farrington Apartments: equitable and/or statutory antiforfeiture laws. In Alabama, there is no statutory authority for undoing an accomplished forfeiture of a lease and leasehold estate. See Ala.Code §§ 3–5–9 *et seq.* (1991). However, there is equity derived authority for a court to grant relief from the termination of a lease. This same equity founded power is also located in decisions of Alabama courts dealing with a lessee's request to enjoin or otherwise prevent a lessor from exercising a right to end a lease and the tenant's estate conveyed under a lease.

■ To frame the perimeters of an Alabama court's equity based authority to relieve a lessee from the termination of a lease and leasehold estate, an understanding of one of the purposes of a lessor's right to cause a lease to be forfeited or ended is helpful. The covenant of forfeiture is what gives the lessor the right to terminate a leasehold estate following a default in payment of rent and it is considered security for payment of the rent. Among other things, this security enforces a lessee's performance of the payment obligations. Absent a contract provision to the contrary, payment of all rent due plus the landlord's damages by a lessee *post-default and before termination* has been viewed as fulfilling the forfeiture covenant's purpose and relieving the necessity for its operation. *Humphrey v. Humphrey,* 254 Ala. 395, 399, 48 So.2d 424, 427 (1950); *Cedrom Coal Co. v. Moss,* 230 Ala. 32, 34–35, 159 So. 225, 227 (1935); *City Garage & Sales Co. v. Ballenger,* 214 Ala. 516, 518, 108 So. 257, 259 (1926); *Cesar v.*

*Virgin,* 207 Ala. 148, 149, 92 So. 406, 407 (1921); see also Jesse P. Evans III, *Alabama Property Rights & Remedies* § 21.5(b)(i) (2d ed.1998). More bluntly, the lessor's security having fulfilled its intended contractual purpose of forcing compliance with the lease's contractual rent requirement obviates the lessor's ability to end the lease and estate conveyed.

While bearing in mind the security purpose underlying the covenant of forfeiture, Alabama's courts have in limited instances utilized it along with the equitable maxim that "equity abhors a forfeiture" as a basis for either granting relief from an accomplished forfeiture of a lease or preventing a lessor's enforcement of the termination of the lease and the estate conveyed under the lease. See, e.g., *Humphrey v. Humphrey,* 254 Ala. 395, 399, 48 So.2d 424, 427 (1950); *City Garage & Sales Co. v. Ballenger,* 214 Ala. 516, 518, 108 So. 257, 259 (1926). Since the Moore lease and the Daniels lease have been terminated, this Court is not faced with a fact pattern involving prevention of Farrington Apartments' exercise of its contractual and/or statutory right to terminate. Despite this, use of Alabama's equity based case law dealing with both preventing a lessor's termination of a lease along with that addressing relief from already terminated leases is helpful in gaining an appreciation of Alabama's limits on avoiding—in its prospective and retroactive usages—forfeitures of leasehold interests for nonpayment of rent.

■ When rent is paid after the due date and accepted by a landlord *before* notice of termination is given, Alabama's courts have consistently held that the landlord has waived late payment as a basis for ending the lessee's tenancy unless the landlord in the lease or otherwise informs the lessee that acceptance of such a payment is not a waiver of the right to termi-

nate. *City Garage and Sales Co. v. Ballenger*, 214 Ala. 516, 518, 108 So. 257, 259 (1926). Likewise, a course of dealing where a tenant repeatedly pays rent late has been used as a basis for not allowing termination of the lease and the tenant's possessory rights thereunder. See *Lynaum Funeral Home, Inc.*, 576 So.2d 169; *Humphrey v. Humphrey*, 254 Ala. 395, 399, 48 So.2d 424, 427 (1950). The same is not the case after a lease is terminated. The general rule in Alabama is that payment, *after termination* of a lease, of rent owed for the period before termination and receipt of these payments by the lessor *without something more than payment* does not waive or undo the ending of the lease and the tenant's leasehold estate. *City Garage & Sales Co.*, 214 Ala. at 518, 108 So. at 259. One should also note that the equitable antiforfeiture remedy if utilized following termination is an after termination holding to not allow a lessor to enforce termination of the lease and the lessee's loss of the possessory interest in the leased property by eviction, unlawful detainer, ejectment, injunction or some other method. This is not the same as the curing of a default under a lease which has not been terminated! [14]

In each instance—tender before or after termination, Alabama's courts acting as courts of equity will not grant relief from loss of the lease and the possessory right conveyed for nonpayment of rent not disputed in amount unless the full sum owed is tendered prior to a lessee's seeking such equitable relief. The opinion of the Alabama Supreme Court in *Dean v. Coosa County Lumber*, 232 Ala. 177, 167 So. 566 (1936) contains this statement of what is required:

> The jurisdiction to relieve against forfeitures is founded upon the principle that a party having legal rights shall not be permitted to use them oppressively to the injustice of the defaulting party, but the principle does not extend so far as to authorize a court of equity to set aside the valid stipulations of the parties upon the performance of which their rights depend. And where there is no controversy as to the balance due, and a reasonable opportunity is afforded for payment or tender, a tender of the amount due is a prerequisite to the right to invoke the jurisdiction of a court of equity to relieve from the forfeiture.

*Dean*, 232 Ala. at 182, 167 So. at 571. See also *Hunter–Benn & Co. v. Bassett Lumber Co.*, 224 Ala. 215, 218, 139 So. 348, 349 (1932); *Carter v. Brownell Auto Co.*, 217 Ala. 690, 117 So. 304, 305 (1928). What must be tendered prior to seeking avoidance of the loss of the lease and the tenant's estate is not just the accrued, unpaid rent.[15] Part of what more is necessitated is the tender of payment of any damages a lessor may have sustained as a result of the nonpayment of rent. See *Cedrom Coal Co. v. Moss*, 230 Ala. 32, 159 So. 225 (1935); *City Garage & Sales Co.*, 214 Ala. 516, 108 So. 257; *Cesar v. Virgin*, 207 Ala.

---

**14.** The difference resides in the interests in property one holds. Pre-termination at least some of the interests aggregating a lease and leasehold estate remain with the lessee. Unless a state's laws which govern what property a lessee holds treat by statute or otherwise the ability to undo the termination as one of the bundle of property interests making up a lease and leasehold estate, in other words, it constitutes an integral portion of those interests aggregating a lease and leasehold estate, a method to undo the ending of a lease is a property interest separate and distinct from the lease and leasehold estate.

**15.** Even the Supreme Court of the United States has recognized this tender requirement before equitable relief from a forfeiture of a lease for nonpayment of rent may be granted. *Sheets v. Selden*, 7 Wall. 416, 74 U.S. 416, 425, 19 L.Ed. 166, 169 (1868).

148, 92 So. 406 (1921); *Abrams v. Watson,* 59 Ala. 524 (1877). This case law makes evident that absent the required tender of payment, Alabama's courts will not invoke equity principles to either prevent termination of a lease and the tenant's right to possession or grant relief from a terminated lease and leasehold estate.

Further complicating the positions espoused by Daniels and Moore for their ability to assume the leases is, that under Alabama case law, the mere tender of payment of rent and damages is not all that is required. There is yet another part of what more is required for Alabama's courts use of their equitable powers. *City Garage & Sales Co.,* 214 Ala. at 518, 108 So. at 259 ("The general rule is that payment after forfeiture [is] declared of rents which accrued before forfeiture, and receipt of the same, without more does not waive an existing forfeiture."). Just what that other part of the "more" is ascertainable by review of Alabama's case law. Generally, it is when the penalty of loss of the leasehold interest is disproportionately greater than the damages suffered by a breach of contract and when termination results in the lessor being unjustly enriched. See, e.g., *Humphrey v. Humphrey,* 254 Ala. 395, 48 So.2d 424 (Termination of lease voided where substantial, valuable improvements made to leased premises, location was only one from which lessee could operate business, and loss of location would end lessee's business. Furthermore, a conflict in evidence existed regarding lessor's demand that future rent payments be made timely. Court held termination was unjust, inequitable, and unconscionable.); *Coley v. W.P. Brown & Sons Lumber Co.,* 251 Ala. 235, 37 So.2d 125 (1948) (Where purchaser paid for timber removal rights for five year period and had right to extension of one year if timber could not be harvested due to conditions beyond purchaser's control, here lack of

labor and certain supplies caused by war, refusal of landowner-seller to extend term by one year following end of initial five year period did not permit exercise of forfeiture of contract and right to timber. Essentially, the court avoided the purchaser losing right to timber in instance where landowner-seller had been paid and there was a valid dispute over contract extension terms.); *Dean,* 232 Ala. 177, 167 So. 566 (Court avoids termination of timbering contract where substantial monies had been paid in advance of timbering and termination resulted in loss of timbering business, loss of timber owned by buyer-lessee under contract's terms, and loss of advance payment by buyer-lessee.).

 What these Alabama cases demonstrate is that the second of the two parts of the "more" than payment of unpaid, accrued rent plus damages necessary to avoid forfeiture of a lease and leasehold is not merely the loss of the leasehold estate, but its loss coupled with the loss of an investment or a business along with (a) an unconscionable gain or conduct by the lessor, or (b) a valid dispute over contract terms sufficient to legally justify the lessee's nonpayment of rent. From analysis of these opinions, two further caveats on equitable relief from the forfeiture of a leasehold estate need to be mentioned. This Court has only located reported Alabama court decisions applying this equity based power when a business or commercial leasehold is involved. Secondly, Alabama's Supreme Court has held that using such equitable powers to avoid a lease's termination is not available for a lessee whose " . . . defalcation has been willful or intentional." *Barry v. Welch,* 248 Ala. 167, 168, 26 So.2d 872, 873 (1946).

 For Daniels and Moore and assuming for purposes of argument that Alabama's courts would apply these equity

based case law holdings to residential leaseholds, no ability under Alabama's laws to seek relief from avoidance of the ending of each's lease with Farrington Apartments existed or exists. The giving of an opportunity to pay the unpaid rent before the effective date specified in the notice of termination coupled with the terminations (a) not imposing a penalty which in proportion results in Farrington Apartments being unjustly enriched, (b) not being based on unjust or unconscionable conduct by Farrington Apartments, and (c) not resulting from inequitable actions by Farrington Apartments, vitiates any basis for Moore or Daniels to seek relief from forfeiture of their respective leasehold estates by use of Alabama's antiforfeiture equity based case law. This position is strengthened when one recalls that the disputes between Farrington Apartments—a non-governmental landlord—and Moore and Daniels do not entail either's loss of the right to participate in HUD's rent subsidy program. Joined with these factors is Moore's and Daniels's failure to disclose their true incomes. In the Moore and Daniels circumstances, this constitutes a failure to pay rent which is a willful and intentional default by each of the terms of their respective agreements with Farrington Apartments. This sort of conduct precludes resort to Alabama's courts' antiforfeiture equitable powers. *Barry*, 248 Ala. at 168, 26 So.2d at 873.

The completed analysis under Alabama's laws is that as of the commencement of Ms. Moore's bankruptcy case she possessed no lease of residential real property and no ability to undo the already effective termination of the lease and her possessory interest in the apartment. The same is true for Ms. Daniels. Each's presence on the property of Farrington Apartments did not and does not under Alabama's laws arise from or under the terms of a lease. Rather under Alabama's law, Moore's and Daniels's remaining on the residential property is unlawful and makes each a "tenant at sufferance ... [whose] possessory right had terminated ..." See *Jordan v. Sumners*, 222 Ala. 314, 318, 132 So. 427, 431 (1930); David C. Skinner, *Alabama Residential, Commercial & Mineral Lease Law* § 2–8 (1997). See also, *Lane v. Henderson*, 232 Ala. 122, 123–24, 167 So. 270, 271 (1936); *Blocton–Cahaba Coal Co.*, 205 Ala. at 376, 87 So. at 562.

### (5) The Evolution of Ending a Lease and Leasehold A/K/A The Fiction of Physical Reentry

With respect to Alabama's laws, a few added remarks are needed. There has been an evolution in when and how a lease and leasehold estate are ended. Early in Alabama's existence, the point of termination of the possessory interest of a lessee was on the physical retaking of the leased real property by the lessor. Overtime, this has been changed to allow termination to occur without the necessity of a lessor physically dispossessing a lessee from the leased real property. Under Alabama's statutes, physical retaking of leased property by a lessor to end a leasehold estate is no longer required. By Alabama's courts' rulings, the lessor and lessee may by contract avoid certain of the common law founded and statutory prerequisites to termination making even easier and quicker the ending of a lease and the lessee's possessory interest in the leased property. As is to be discussed *infra* for other jurisdictions, these advances in Alabama's laws allowing parties to a lease to specify instances supporting the ending of a lease which had not previously existed at common law or by statute, simplifying what needs to be done to end a lease and leasehold estate, and accelerating the time period for accomplishing terminations have occurred elsewhere. It is these progressions in the landlord-tenant

relationship ending laws which must be kept in mind during the discussion of the methods used by some federal courts for extending a lessee's leasehold estate's existence beyond the point state laws so fixes. By consideration of the evolution of the ending of a lease for default in payment of rent, what becomes apparent is that the modifications in this area of Alabama law have *not* been to make the ending of one's interest in a lease and leasehold estate more difficult, more technical, or more drawn out.

## V. *The Deconstructionism*

### A. *Overview*

Given this Court's holding that under Alabama law the Moore and Daniels leases ended before bankruptcy and each is not entitled to relief from termination under state antiforfeiture equitable case law, what must be addressed is the further convolution caused by a body of bankruptcy case law which interprets one or more of 11 U.S.C. §§ 362(b)(10), 365(c)(3) & 541(b)(2) in a manner which expands the scope of 11 U.S.C. § 365(a) & (d)(2) and overrides the longstanding procedure espoused in *Butner* for ascertaining just what property a debtor possessed at the instant he or she files a bankruptcy case. The why for consideration is that should what is being done by certain courts sitting as courts of bankruptcy be correct, it is a method by which state laws marking the boundaries of one's property interests are altered. By following these courts' interpretations of parts of the Bankruptcy Code, that which under state law is no longer a property interest and under *Butner, et al.* is not property of the estate becomes an unexpired residential lease of real property which is (i) treated as property of the estate, (ii) accorded certain protections by the automatic stay of 11 U.S.C. § 362(a), and (iii) assumable under 11 U.S.C. § 365(a) & (d)(2).

How this has been occurring under the Bankruptcy Code is disclosed by resort to consideration of bankruptcy case law dealing with stay modification and lease assumptions. This is because disputes which arise in these contexts frequently entail consideration of some or all of the identical legal issues and the means utilized by some courts to achieve denial of stay modification with respect to and/or the allowance of assumption of a residential lease of real property. To understand what is being done does not require recourse to a discussion of all cases involving these issues. Rather, it is sufficient to outline the modes used to find the existence of an unexpired lease of residential real property along with consideration of how these methods are applied in cases primarily from some of the courts within the jurisdictions comprising the Courts of Appeals of the United States for the Sixth, Ninth, and Eleventh Circuits.

### B. *Structure of Deconstruction Methodologies*

#### (1) *Not Objectionable Types*

Certain of the reasons for why a residential lease of real property is property of a bankruptcy estate are proper and not validly questionable. These include (i) the failure of a lessor to properly end a lease as required by contract, case law, or statute, (ii) not having the right to default and forfeit the leasehold interest for nonpayment or other breach of the lease, and (iii) certain actions occurring before the ending of the lease and estate conveyed and those happenings after termination constituting a waiver of the right of a lessor to enforce forfeiture of the tenant's leasehold estate.

These enumerated bases for why there exists an unexpired lease of residential real property as of a debtor's filing bankruptcy are not the subject of this Court's attention. This is due to the fact that, in

general, a failure to follow proper procedure to end, lack of a valid reason for termination, and/or lessor conduct constituting a waiver of the right to forfeit a leasehold estate should, absent other intervening factors, result in a ruling under state law that the subject lease and conveyance were not ended prior to one's filing bankruptcy or that the termination will not be enforced because of waiver of the right to so do by the lessor.[16] For 11 U.S.C. § 541(a) purposes, this leaves the debtor on the bankruptcy cleavage date possessing a bundle of property interests aggregating under state law the whole of a residential real property leasehold estate which constitute "property of the estate" under § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a).

### (2) *The Considered Means*

The focus of this Court is the processes employed to contend that the termination of a lease of residential real property is not final, i.e., incomplete, or the terminated lease remained potentially capable of being what is variously described as undone, avoided, voided, or revitalized, reinstated, reversed, resurrected, or relieved. Most of the courts which use one or more of the methods to be discussed start with a recitation from *Butner v. U.S.*, 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 917–18 n. 9, 59 L.Ed.2d 136, 141 n. 9 (1979), or one of its adherents that reference is to be made to state law to locate a debtor's interests in property as of the filing of bankruptcy. Although not necessarily stated as a followed formula,

each court looks to see if the lease was terminated under applicable state law before the filing of the bankruptcy case. Next, if terminated, is the determination of whether the ending is avoidable under a state antiforfeiture provision or other state law. See, e.g., *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1469–72 (9th Cir.1988); *City of Valdez v. Waterkist Corp. (In re Waterkist Corp.)*, 775 F.2d 1089, 1091 (9th Cir.1985); *In re Ross v. Metropolitan Dade County*, 142 B.R. 1013, 1015–16 (S.D.Fla.1992); *In re Atkins*, 237 B.R. 816, 818–19 (Bankr.M.D.Fla.1999). See also, e.g., *Kopelman v. Halvajian (In re Triangle Laboratories, Inc.)*, 663 F.2d 463, 471 (3d Cir.1981); *In re Mimi's of Atlanta, Inc.*, 5 B.R. 623, 628–29 (Bankr.N.D.Ga. 1980) *aff'd*, 11 B.R. 710 (N.D.Ga.1981). This two-step analysis sets the stage for what ensues. For to be an unexpired lease of residential real property for Bankruptcy Code purposes, either the termination of the lease must not be effective pre-bankruptcy or its ending has to be relieved somehow either pre-bankruptcy or post.

### (a) *Linguistics & Maxims*

One of the ways by which a termination is determined ineffective is by using variations of a maxim of statutory construction, stated as such or not, that the expressed exclusion of ended nonresidential real property leases from (i) the protections of the automatic stay of § 362(a) by the language of § 362(b)(10),[17] (ii) assumption un-

---

**16.** This may not always be the case. See, e.g., *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1471 (9th Cir.1988). The *Windmill Farms* court cites *Guntert v. City of Stockton*, 55 Cal.App.3d 131, 138–40, 126 Cal.Rptr. 690, 693–94 (1976) for the proposition that termination may be effective even if a tenant prevails in an unlawful detainer suit. This evidences some of the diversity in the various states' laws.

**17.** 11 U.S.C. § 362(b)(10): "The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

\* \* \* \* \* \*

under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or

der § 365(a) by the wording of § 365(c)(3),[18] and (iii) property of the estate under § 541(a) by the phraseology of § 541(b)(2),[19] evidences the legislatively intended inclusion of leases of residential real property terminated pre-bankruptcy as within the perimeters of the stay protections of § 362(a), the assumability of leases under § 365(a) & (d)(2), and property of the estate under § 541(a)(1). See, e.g., *In re Ross v. Metropolitan Dade County*, 142 B.R. 1013, 1015 (S.D.Fla. 1992); *In re Morgan*, 181 B.R. 579, 583–84 (Bankr.N.D.Ala.1994); *In re Talley*, 69 B.R. 219, 223 (Bankr.M.D.Tenn.1986).

Woven into this maxim argument is the contention of a semantical purpose revealed by the same three subparts of the Bankruptcy Code, 11 U.S.C. §§ 362(b)(10), 363(c)(3) & (d)(2), and 541(b)(2). Some courts assert this linguistic distinction to bolster the maxim based argument by looking to the everyday, nonlegal definitions of terminate and expire—their claimed plain meanings—and arguing that as commonly used they are different in meaning. Terminate is said to be some action which prematurely brings a lease to an end which is different from an ending by the passage of time to the stated term that is its expiration. *In re Ross*, 142 B.R. 1013, 1015 (S.D.Fla.1992); *In re Morgan*, 181 B.R. 579, 583–84 (Bankr.N.D.Ala. 1994); *In re Talley*, 69 B.R. 219, 223 (Bankr.M.D.Tenn.1986). Using this so-called plain meaning usage distinction in conjunction with the statutory interpretation maxim that exclusion of one includes the other, unexpired is deemed to have been intentionally selected so leases of residential real property ended before running of the stated term, i.e., the so-called terminated ones, are not expired, that is they are unexpired. It is argued that these statutory interpretation devices evidence that Congress did not use terminate and expire synonymously. This is a part of the foundation for why a residential lease of real property terminated under state law purportedly may remain unexpired for purposes of § 365(a) & (d)(2) assumption. See e.g., *In re Ross*, 142 B.R. 1013, 1015 (S.D.Fla.1992); *In re Morgan*, 181 B.R. 579, 583–84 (Bankr.N.D.Ala. 1994); *In re Talley*, 69 B.R. 219, 223 (Bankr.M.D.Tenn.1986).

(b) *The Analogy—Mortgages & Leases*

Another device wielded to support the position that a lease is unexpired for § 365(a) & (d)(2) assumption is to analogize to the law of mortgages and the point at which it is contended the ability to avoid the loss of all of one's legal and equitable interests in the mortgaged real property is ended. In states which permit nonjudicial foreclosures, this so happens to be when the equitable right of redemption is extinguished which generally is on the sale of

---

18. 11 U.S.C. § 365(c)(3): "The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

\* \* \* \* \* \*

such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief;"

19. 11 U.S.C. § 541(b)(2): "Property of the estate does not include—

\* \* \* \* \* \*

any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case;"

the real property at foreclosure to another. *Commercial Federal Mtg. Corp. v. Smith (In re Smith)*, 85 F.3d 1555, 1557–58 (11th Cir.1996) (citing as authority *Federal Deposit Ins. Corp. v. Morrison*, 747 F.2d 610, 613 (11th Cir.1984)); *Trauner v. Lowrey*, 369 So.2d 531, 534 (Ala.1979); *In re Greene*, 248 B.R. 583, 607 (Bankr.N.D.Ala. 2000) (citing as authority *Summerford v. Hammond*, 187 Ala. 244, 65 So. 831 (1914)); *Gerasimos v. Continental Bank*, 237 Mich. 513, 518–19, 212 N.W. 71, 73 (1927). In this type of foreclosure transaction, the sale need not be confirmed by court order. When foreclosure by judicial decree is the procedure followed, the right of equitable redemption may be lost at another point along the way to its sale. In some states, it is when "... a mortgagee seeks and is granted a decree of foreclosure." *Hausman v. City of Dayton*, 73 Ohio St.3d 671, 676, 653 N.E.2d 1190, 1194 (1995); *Ohio Dept. of Taxation v. Plickert*, 128 Ohio App.3d 445, 447, 715 N.E.2d 239, 241 (1998). Then from entry of the decree of foreclosure until court confirmation of the sale following its having occurred, a period of statutory redemption may be allowed. *Hausman*, 73 Ohio St.3d at 676, 653 N.E.2d at 1194;; *Plickert*, 128 Ohio App.3d at 447, 715 N.E.2d at 241 (foreclosure decree "... generally terminates the debtor's common-law right of equitable redemption."); *Wayne Savings & Loan Co. v. Young*, 49 Ohio App.2d 35, 37–38, 358 N.E.2d 1380, 1381–82 (1976); see also Ohio Rev.Code Ann. § 2329.33 (2002). When foreclosure by judicial decree is used, just where the right of equitable redemption is lost may be different in other jurisdictions. See, e.g., *Swift v. Kirby*, 737 S.W.2d 271, 279–77 (Tenn.1987)(Detailing development of equity of redemption in Tennessee and the historical misuse of equity of redemption to describe both the right of equitable redemption and statutory redemption. Today in Tennessee, "equity of redemp-tion" usage now includes the statutory right of redemption set forth in Tenn.Code Ann. § 66–8–101, *et seq.*).

During the case law decision development of the point at which all of one's interests in mortgaged real property are ended and before the split in authority among the Circuit Courts of Appeals of the United States on the point after which a default under a mortgage may no longer be cured, compare *In re Roach*, 824 F.2d 1370 (3rd Cir.1987), with *In re Glenn*, 760 F.2d 1428 (6th Cir.1985), was resolved by a 1994 amendment to 11 U.S.C. § 1322 setting forth what is now § 1322(c)(1), some Bankruptcy Courts analogized how and when all interests in a lease and leasehold estate are ended to how the Sixth Circuit in *In re Glenn* selected the point of loss of all interests of a consumer-debtor in mortgaged residential real property. The so-called analogous leasehold estate ending point is required by some bankruptcy courts to be where the debtor-lessee (i) no longer has any property interests forming any portion of what is a leasehold estate, and (ii) does not have any further ability to obtain relief from the forfeiture of the leasehold estate. This point in the lease-leasehold estate ending process is variously recited to be at some point from the of entry of a judgment of possession in an unlawful detainer suit to the later issuance, service, or execution of a writ of possession in such a suit. See, e.g., *In re Ross*, 142 B.R. 1013, 1015–16 (S.D.Fla.1992) (unclear whether issuance of judgment or service of writ of possession); *In re DiCamillo*, 206 B.R. 64, 67 (Bankr.D.N.J.1997) (entry of judgment for possession); *In re Atkins*, 237 B.R. 816, 819 (Bankr.M.D.Fla.1999) (unclear whether issuance of judgment or service of writ of possession); *In re Morgan*, 181 B.R. 579, 585 (Bankr.N.D.Ala. 1994) (execution of writ of possession); *In re Yardley*, 77 B.R. 643, 644 (Bankr.

M.D.Tenn.1987) (execution of writ of possession); *In re Talley*, 69 B.R. 219, 225 (Bankr.M.D.Tenn.1986) (service of writ of possession). By analogy to the *Glenn* mortgaged residential real property methodology, these courts argue that it is only at such a point where all of the lessee's interests in the leasehold estate are unalterably ended.

Once the lease termination is viewed as incomplete due to the absence of either a final judgment or issuance/service of a writ of possession in an unlawful detainer suit, the unexpired status of the lease for assumability purposes is pre-ordained by those using the mortgage analogy argument. It is contented that this state of affairs results from the possessory interest of the lessee, which is sometimes also referred to as the estate conveyed, not having been ended.[20]

### (c) *Antiforfeiture*

Yet another way followed to establish an unexpired residential real property lease for § 365 assumability is application of what are denominated as antiforfeiture statutes and similar equity based case law rulings. Although sometimes the antiforfeiture laws or the equitable powers of a court are used preemptively to stop a lessor from ending a lease and the tenant's possessory right thereunder, this type of relief from the forfeiture of a leasehold estate is not germane to this discussion because the preemptive use of these antiforfeiture provisions by a tenant will take place before the termination of the lease and the lessee's possessory interest. In the context of a bankruptcy, a case of peremptory use of antiforfeiture provisions means that the lessee's interest in the leasehold estate was not eliminated before the bankruptcy case was filed. The outcome is usually that the lessee's possessory interest conveyed under the lease (i) was not ended under state law before bankruptcy, (ii) was not terminated/expired under the national law governing bankruptcy, and (iii) is an interest which may be property of the estate under § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a).

For this Court's analysis, it is when under the governing jurisdiction's laws a residential lease of real property is ended

---

**20.** Although it is beyond the scope of what this Court needs to discuss for resolution of these matters, the interests in the underlying property, if any, is where the Bankruptcy Code analysis needs to focus more attention. It entails whether the property interest or interests are sufficient under the Bankruptcy Code for such actions as assumption of a lease, grant or denial of modification of the automatic stay, or modification of rights under a Chapter 9, 11, 12, or 13 plan. All too often, courts simply find the existence of some interest, no matter how small, insignificant or tangential, as the basis for allowing assumption, denial of stay modification, or modification of rights under a plan. At the extremes where a debtor holds all or none of the interests in property, the analysis is simple. It is those points on the continuum between none to all where the inquiry becomes more complex unless any interest no matter how trivial, yet greater than no interest, is sufficient for Bankruptcy Code purposes. Should more than just any interest in property be required, the analysis should include whether an interest in property which is less than all of the bundle of property interests constituting the whole of what is real estate, a lease, a car, etc. is sufficient quantitatively and qualitatively to support the actions taken under the Bankruptcy Code. Also, consideration of whether the interests in property held by a debtor are inferior to those of another such as a creditor should be part of the analysis undertaken to ascertain if the interests are sufficient in amount and kind to support what is sought under the Bankruptcy Code. In an as yet to be published article, Professor Stephen J. Ware presents an excellent discussion broaching this analytical approach. Stephen J. Ware, *Security Interests, Repossessed Collateral and Turnover of Property to the Bankruptcy Estate*, 2002 Utah L.Rev. (forthcoming).

before the tenant's bankruptcy that these statutory and equitable case law antiforfeiture remedies must be looked to determine whether there is a residential lease of real property which becomes property of a bankruptcy estate. While before the merger of courts of law with those of equity many jurisdictions developed a body of case law utilizing equitable principles to sometimes relieve a lessee from forfeiture of a leasehold estate, some states also enacted laws which specify the when, how, and on what basis relief may be accorded from the forfeiture of a leasehold. See, e.g., *Wilson v. Bill Barry Enterprises, Inc.,* 822 F.2d 859, 861–62 (9th Cir.1987) (citing California statutes for relief from lease forfeitures); *In re Great Feeling Spas, Inc.,* 275 B.R. 476, 478–81 (Bankr. D.N.J.2002) (delineating New Jersey's equitable case law antiforfeiture development and its statutory codification); *Executive Square Office Building v. O'Connor and Associates, Inc.,* 19 B.R. 143, 147–48 (Bankr.N.D.Fla.1981) (examining Florida's statutory and equity based leasehold antiforfeiture law). Other states, such as Alabama, which adopted by case law equitable relief in limited circumstances from lease forfeitures do not have similar legislation to accomplish the same end. See Ala.Code §§ 35–9–1 *et seq.* (1991).

These antiforfeiture case law and statutory provisions are how certain courts have utilized the Bankruptcy Code to alter what state law necessitates. They treat nothing more than the possibility of such relief under either a statute or case law as making the termination of a lease and the estate conveyed not final regardless of whether the lessee-debtor could demonstrate entitlement to relief from forfeiture under the jurisdiction's laws. It is simply the potential for such relief under state law, not one's entitlement, which is the basis on which pre-bankruptcy terminated residential leases of real property are as-

serted to be unexpired for § 365(a) & (d)(2) assumption. No degree of proof is required showing that the debtor-lessee could ever fall within either the statutory or equitable case law prerequisites for relief from forfeiture.

Furthermore, these courts treat the state law based prerequisites to relief from a forfeited leasehold as if they are simply the curing of a default under an existing contract, not as a contract which does not exist absent relief from the state law status that the lease and possessory right thereunder were ended pre-bankruptcy. See, e.g., *In re Ross,* 142 B.R. 1013, 1016–17 (S.D.Fla.1992); *In re Atkins,* 237 B.R. 816, 819 (Bankr.M.D.Fla.1999); *Executive Square Office Building v. O'Connor and Associates, Inc.,* 19 B.R. 143, 147–48 (Bankr.N.D.Fla.1981). Effectively, these courts treat the statutory and/or equity based forfeiture relief as an interest in property constituting a portion of the bundle of interests aggregating the whole of the lease and leasehold estate and not as a separate property interest. This is a critical distinction when it comes to the existence of a lease for purposes of § 541(a) of the Bankruptcy Code. It is also one susceptible of disparate treatment under the statutes of the varying subjurisdictions aggregating the United States.

## C. *Deconstructionism Scrutinized*

Having outlined the methods utilized by some courts to find "unexpired" status for a residential lease of real property, what remains for this Court to do is ascertain whether any are proper. Deference to the statutory structure of the Bankruptcy Code for what is property of the estate and the *Butner* based call for reference to state law to locate a debtor's interests in property leads to the conclusion that it is inappropriate to implement a generally applicable procedure by use of these methods

for finding that a residential real property lease ended under a jurisdiction's laws pre-bankruptcy remains unexpired for § 365 assumption purposes. One should note that given the contract terms of a particular residential lease of real property, the relevant jurisdiction's statutes and other laws, plus the facts of the matter before a court, what are being used by some courts as general rules applicable to all residential real property lease assumptions may lead to a correct result under a particular collection of legal and factual circumstances. The point is that the differences between (i) each jurisdiction's laws—which often vary within a state, (ii) the contract terms, and (iii) the facts necessitate a case by case resolution of assumability of residential real property lease under 11 U.S.C. § 365(a) & (d)(2). This is precisely what the methods outlined above avoid. To better understand the problems inherent in the methodologies implemented, review of each in the context of cases utilizing one or more is warranted. It also demonstrates why each is inapplicable to the Moore–Daniels–Farrington Apartments disputes.

(1) *Plain Meaning, Linguistics, and Expressio Unius Est Exclusio Alterius—Not So Plain or Included*

(a) *Linguistically Indeterminate, that is, Not Plain*

 To allow assumption of a lease of residential real property, part of what is relied on under a so-called plain meaning interpretation of portions of the Bankruptcy Code in conjunction with the statutory interpretation maxim of expressing one excludes the other is the wording of 11 U.S.C. § 365(c)(3) & (d)(2):

(c) The trustee may not assume or assign any executory contract or *unexpired* lease of the debtor, whether or not such contract or lease prohibits or re-stricts assignment of rights or delegation of duties, if—

\* \* \* \* \* \*

(3) such lease is of *nonresidential real property* and has been *terminated* under applicable nonbankruptcy law prior to the order for relief; ...

\* \* \* \* \* \*

(d) ... (2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or *unexpired lease of residential real property* or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(c)(3) & (d)(2) (emphasis added). It is argued that a distinction is proven by the use of "unexpired" for assumption of leases of residential real property in § 365(d)(2) versus "terminated" in § 365(c)(3) for the nonassumability of leases of nonresidential real property.

Further support for this supposed distinction in the statute's usage is premised on § 362(b)(10)'s language for placing outside the automatic stay's zone of protection any act by a lessor with respect to a lease of nonresidential real property "... terminated by the expiration of the stated term ..." before or during a bankruptcy case. The implication proffered is that terminated by expiration means a lease ended by running to the end of the original term stated, not one shortened by some act of a lessor.

Similarly, the wording of § 541(b)(2) for excluding nonresidential real property leases from property of a bankruptcy estate is recited for its usage of "... terminated at the expiration of the stated term

.... " Again, Moore–Daniels and the authorities on which they rely reason that "terminated at the expiration" refers to leases which have run the full course of the original time period set forth in a lease, not one set by a default which allows the ending of a lease at a date earlier than the one originally fixed. These are some of the factors which it is contended demonstrate why "terminated" is not identical under a plain meaning interpretation as "expired" and results in the argued conclusion that pre-bankruptcy terminated residential leases remain "unexpired" post-bankruptcy. These are plain meaning arguments using these words as a non-lawyer might. It is their non-specialized, everyday usage on which this argument rests.

The debtors in the cases before this Court further contend that "expired" and "terminated" as used in these subparts of the Bankruptcy Code are not "precisely synonymous" because to treat them otherwise makes § 365(c)(3) (nonassumability of nonresidential lease terminated pre-bankruptcy), 11 U.S.C. § 541(b)(2) (exclusion of nonresidential lease from property of the estate when ended before filing of bankruptcy or after filing of the bankruptcy case), and 11 U.S.C. § 362(b)(10) (nonapplicability of automatic stay of § 362(a) to acts of lessor regarding nonresidential lease terminated by expiration of stated term before or after filing of bankruptcy case) unnecessary and superfluous. Other than by the assertion of unnecessary and superfluous, just why this is so is not further enunciated. If one pauses to think about this argument, those proffering them are essentially discussing the argued difference in meaning of terminate and expire/expiration as used in these statutory provisions. It is an argument of their specialized or technical usage within three sections of the Bankruptcy Code. This

plain meaning argument is different from the others asserted in this respect.

Not willing to rest their arguments on just these factors, Moore and Daniels also turn once more to the layperson's usage of terminate and expire as defined by sources of English usage and the specialized use of one by reference to legal usage sources. Again, this is two different versions of plain meaning's determination. Proof that each has a separate and distinct meaning is supposedly revealed by reference to dictionary and state law definitions of these words. It is posited by the case law citations used by Daniels and Moore that their usage is not interchangeable. To demonstrate this definitional difference, at least three sources are recited: *Webster's II New Riverside University Dictionary* 454, 1194 (1998), *Black's Law Dictionary* 579, 1471 (6th ed.1990), and *Vizard Inv. Co. v. Mobile Fish & Oyster Co.*, 197 Ala. 625, 73 So. 328 (1916).

Review of one of the definition citations proffered to this Court joined with use of a more complete source of English usage shows that their layperson's plain usage proposition is not so plain. Although it is accurate that one may be used to denote something which comes to an end, i.e., expires, and the other may mean something which is brought to an end, i.e., terminates, one of the cited repositories of these definitions for expire and terminate, *Webster's II New Riverside Dictionary* 454, 1194 (1988), undercuts the argument that expire may not include terminate within its usages. Expire is defined as "... [t]o come to an end: terminate ...." This source of authority also has this as a meaning of expiration: "1. The act of coming to a close: TERMINATION...." *Webster's II New Riverside Dictionary* 454 (1988).

Moreover, a highly regarded and authoritative source of English usage is the

*Oxford English Dictionary.* A cursory review of its cites to the usages of expire reveals that, contrary to the Daniels–Moore assertion that expire is always intransitive, it is used as both a transitive and intransitive verb. One of the delineated usages of expire is "... to terminate...." 5 *Oxford English Dictionary* 568 (2d ed.1989). Thus, the argument that expire and terminate are not synonymous is not supported by resort to a layperson's usage. In fact, each dictionary demonstrates that, depending on the context, both may be used as a synonym for the other.

■ Added to their sources for usages of unexpired and terminate to support their plain meaning contentions is how the Supreme Court of Alabama construed expiration in a 1916 opinion while determining whether one may receive double the amount of annual rent under the predecessor to Ala.Code § 35–9–100(3), Ala.Code 1907 § 4273 (1907), captioned "Damages for Detainer after Expiration of Term of Lease." The case referenced is *Vizard Inv. Co. v. Mobile Fish & Oyster Co.,* 197 Ala. 625, 73 So. 328 (1916). It is inapt to use a state court decision of what expiration is for purposes of a state statute as indicating what is an unexpired lease of residential real property assumable under § 365(a) & (d)(2) of the Bankruptcy Code, 11 U.S.C. § 365(a) & (d)(2) and a terminated lease of non-residential real property under 11 U.S.C. §§ 362(b)(10) & 541(b)(2). Instead, the determination of what is an unexpired lease for § 365(c)(3), and a terminated lease for §§ 362(b)(10) & 541(b)(2) is one governed by federal law. See *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1943); *Prudence Realization Corp. v. Geist,* 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed. 1293 (1942); *Meade Township v. Andrus,* 695 F.2d 1006, 1009 (6th Cir.1982); see also *Palmore v. First Unum,* No. 1010802, 2002 WL 1398015, at *2 (Ala.2002).

Joined with these problems with the plain meaning interpretation urged by Moore and Daniels via reliance on *Talley* and *Morgan* for one or more of their plain meaning contentions are other reasons why each is, at a minimum, not unambiguous support for their arguments. Any reading of "terminated" as used in § 365(c)(3) is susceptible of meaning either or both a lease which ends on the original date specified in a lease or one ended before such a date due to one's default or other cause. So, too, for § 362(b)(10)'s terminated by expiration of the stated term phraseology. It may be read to be (i) the arrival of the stated date, e.g., March 1 of a given year, or a specific period from a fixed starting date, (ii) when the lessor by contract right may end the term on the occurrence of an event such as for a default, or (iii) when the contract specifies an act or occurrence by a third party or outside cause which ends the lease, such as by condemnation or destruction of leased property. This applies equally to any reading of § 541(b)(2). The stated term of a lease may be either (i) one either fixed and known or calculable at the time of contracting, or (ii) one which by the terms of the contract is not fixed, known, or calculable, but occurs on the happening of certain events, again destruction of the leasehold estate or its condemnation, or by action of a lessor when provided for by the contract terms such as a default by the lessee.

All of this discussion leads to the conclusion that Moore, Daniels and their authorities' contentions do not clearly and unequivocally support plain meaning as a basis for resolution of whether a state law ended residential real property leasehold may yet be property of one's bankruptcy estate and assumable. Rather and the

better argument, if not the opposite of the plain meaning utilized in *Talley* and *Morgan*, is that when one relies on such a statutory construction argument its limitations should be understood. One is:

> ... it might at some times in some domains be useful to take plain meaning as presumptively controlling in interpreting statutes, what is the "plain meaning" that is to have this force? Here it is important to start with a caveat and then draw a few distinctions. The caveat is that no sensible defense of a plain meaning approach takes it to be applicable to all items of statutory language, since many are simply not plain. The degree of plainness, that is the degree of convergence of extension of language among readers of that language, is just that—a matter of degree. At one end of this spectrum of determinacy, it is implausible to suppose that linguistically indeterminate language, language in which there is limited convergence of interpretation within the field of likely interpreters, can be interpreted according to a plain meaning approach.

Frederick Schauer, *The Practice and Problems of Plain Meaning: A Response to Aleinikoff and Shaw*, 45 Vand. L.Rev. 715, 737–38 (1992).

Essentially, the Moore–Daniels plain meaning arguments in the Bankruptcy Code context of assumability or not of residential leases of real property are, at the least, on the linguistically indeterminate side of the usage scale. This vitiates the ability of one to urge "plain meaning" as support for what Moore and Daniels seek [21] and what *Talley*, and *Morgan*, and their followers contend.

Perhaps the part of this methodology used to achieve assumption status for pre-bankruptcy terminated residential real property leases which supports that the declared plain meaning is not so plain is its utilizers' reliance on another statutory interpretative device. For if the language was so plain in meaning, why is resort to another interpretation mechanism necessary? It should not be necessary. See, e.g., *JC Produce, Inc. v. Paragon Steakhouse Restaurants, Inc.*, 70 F.Supp.2d 1119, 1121–22 (E.D.Cal.1999). Contra *Chesapeake & Ohio R. Co. v. U.S.*, 571 F.2d 1190, 1194 (D.C.Cir.1977). Added to these problems with the plain meaning sort of interpretation is the rejection of these arguments by a Circuit Court of Appeals which initially accepted as accurate in a portion of its *dictum* some of the other parts of the deconstruction methodologies.[22] In *Robinson v. Chicago Hous-*

**21.** Close analysis of the Moore–Daniels contentions and the authorities on which they rely regarding "plain meaning" is that they shift between how a non-specialized American lawyer might interpret terminate and expire/expiration and how a layperson might interpret terminate and expire/expiration. Some argue it is to be how a non-specialized American lawyer might use these words. See Frederick Schauer, *The Practice and Problems of Plain Meaning: A Response to Aleinikoff and Shaw*, 45 Vand. L.Rev. 715, 739 (1992). Others contend it is a different usage analysis for plain meaning purposes. See T. Alexander Aleinikoff and Theodore M. Shaw, *The Costs of Incoherence: A Comment on Plain Meaning, West Virginia University Hospitals, Inc. v. Casey, and Due Process of Statutory Interpretation*, 45 Vand. L.Rev. 687 (1992).

**22.** In its subsequent opinion of *Williams v. Chicago Housing Authority (In re Williams)*, 144 F.3d 544, 549 (7th Cir.1998), the Seventh Circuit upheld § 362 stay modification to enable a state court to consider a lessee's defenses to the lessor's termination of the residential lease. It also refused to adopt what it calls *dictum* in *Robinson* of a bright line rule that no lease in Illinois is ended before a landlord gets a judgment of possession. The *dictum* portion of *Robinson* not adopted as a holding in *Williams* is the part of *Robinson* where the *Robinson* panel accepted as accurate other portions of the deconstruction

*ing Authority (In re Robinson)*, 54 F.3d 316, 320 (7th Cir.1995), while rejecting such usage differentiation between terminate and expire, the Seventh Circuit sets forth in its opinion:

> Hence we conclude that federal bankruptcy law draws no meaningful distinction between "expired" and "terminated" residential leases and does not provide greater federal protection for lessees under residential leases, the stated terms of which have not run, even though they may have been otherwise terminated. *Instead the federal law allowing "unexpired" leases to be assumed calls for a determination whether a lease has ended under state law.*

(Citations omitted and emphasis supplied.)

### (b) *Exclusion/Inclusion*

█ Premised on the "terminated" in § 365(c)(3) which details the exclusion from assumption of nonresidential real property leases which end before a debtor-former lessee's filing of bankruptcy, Moore and Daniels further argue that the absence of verbiage to include pre-bankruptcy terminated residential leases within § 365(c)'s or a similar statutory limitation on assumption evidences that pre-bankruptcy terminated residential leases are assumable. In other words, the exclusion of terminated nonresidential real property leases evidences the inclusion of residential real property leases. This argument, however, does not address how § 365 may be utilized to make a lease and leasehold estate ended pre-bankruptcy property of a debtor's estate within 11 U.S.C. §§ 541(a), 1306(a).

This § 365(c)(3)-§ 365(d)(2) argument is mimicked for § 362(b)(10). It is that the expression that acts of a lessor regarding terminated nonresidential real property leases as excluded from being enjoined by the automatic stay means acts of a lessor regarding similarly pre-bankruptcy ended residential real property leases are subject to the statutory injunction's reach. There is an assumption implicit in this argument which is not supported: if such acts of a lessor are subject to the automatic stay for residential real property leases, the lessee has a property interest which is a lease and leasehold estate. The problem is that the lessee may be a tenant at sufferance or similar tenant with no property interest in a lease or leasehold estate. Acts against the former lessee to force such a bankrupt to vacate the residential real property are stayed under 11 U.S.C. § 362(a)(6) even if the debtor has no lease or leasehold estate.

Identical to their § 365(c) and § 362(b)(10) claims is that made for § 541. Moore and Daniels postulate that § 541(b)(2)'s stated exclusion of pre-bankruptcy terminated nonresidential real property leases from being property of the estate demonstrates inclusion of similarly terminated leases of residential real property within § 541(a)'s property of the estate. Just as with the plain meaning interpretations asserted, these exclusion of one, means inclusion of the other founded arguments do not rest on references to legislative history. All that Moore, Daniels, and their cited authorities, *Talley, In re Yardley*, 77 B.R. 643 (Bankr.M.D.Tenn.1987), *Morgan*, and those courts adopting their rationale, do is argue variations of *expressio unius est exclusio alterius* without examination of the legislative history for

---

methodologies by reliance on cases, in particular *Ross v. Metropolitan Dade County (In re Ross)*, 142 B.R. 1013 (S.D.Fla.1992), aff'd without op., 987 F.2d 774 (11th Cir.1993); and *In re Talley*, 69 B.R. 219 (Bankr.

M.D.Tenn.1986), which are discussed later in this opinion. The *Williams'* Court's conclusion regarding *Ross* and *Talley* is that the deconstruction portions assumed correct in *Robinson* are not.

these statutory provisions. Contrary to the maxim argument used, the legislative history of the 1984 enactment of §§ 362(b)(10), 365(c)(3), & 541(b)(2) set forth *infra* indicates Congress addressed only the perceived problem relating to nonresidential real property leases. There is no reference to residential real property leases. It is most significant that the previously recited legislative history is devoid of any indicated legislative intent and attempt to include as property of the estate under §§ 541(a) & 1306(a) any pre-bankruptcy ended residential real property lease. See H.R.Rep. No. 98–882 (1984); S.Rep. No. 98–65 (1983); S.Rep. No. 98–55 (1983); H.R.Rep. No. 98–9 (1983). See also S.Rep. No. 95–1106 (1978); S.Rep. No. 95–989 (1978), U.S.Code Cong. & Admin.News 1978, 5787; H.R.Rep. No. 95–595 (1977), U.S.Code Cong. & Admin.News 1978, 5963.

There are other problems with these statutory interpretation assertions. Resort to the legislative history for the 1984 addition of subsections 362(b)(10), 365(c)(3), and 541(b)(2) evidences that it does not support the proposition that delineating only nonresidential real property lease interests as excluded from each section's operation evidences the inclusion of former interests of a debtor under residential real property leases ended pre-bankruptcy as property of a debtor's bankruptcy estate under 11 U.S.C. § 541(a) which may be assumed as an unexpired lease under 11 U.S.C. § 365(a) & (d)(2). Rather, the legislative history is contrapositive to these maxim and usage claims and demonstrates a different statutory purpose was intended. Moreover, a review of this legislative history exposes that terminate and expire were used as interchangeable.

The drafters of the 1984 amendments wanted, in the context of nonresidential real property leases involving a debtor, to enable a lessor to recover property which had been subject to a lease ended pre-bankruptcy and relet it without further delay caused by a debtor's bankruptcy filing. In part, each was enacted to accelerate a lessor's ability to relet.

Language of the extant legislative history is:

> [11 U.S.C. § 541(b)(2)] amends Section 541 of Title 11, United States Code, to make clear that the debtor's interest in property subject to a non-residential lease which has expired by virtue of its own terms is not property of the estate and that a proceeding to obtain possession of such property is not automatically stayed by Section 362 of the Code.
>
> This amendment is intended to permit landlords to proceed promptly in state court to reclaim possession of non-residential leased premises where such lease has *expired* by its own terms, i.e., because a specified *termination* date of the lease has been reached. This change is intended to facilitate the ability of the landlord to re-lease non-residential space to another tenant as soon as possible.
>
> \* \* \* \* \* \*

S.Rep. No. 98–65 (1983) (emphasis added).

Section 541(b)(2) was added by § 363(a) of the Leasehold Management Amendments within the Bankruptcy Amendments and Federal Judgship Act of 1984 to clarify that there is excluded from property of the estate "any interest of the debtor as a lessee under a lease of nonresidential real property that has *terminated at the expiration* of the stated term of [the] lease . . . ." 11 U.S.C. § 541(b)(2) (emphasis added).[23] This exclusion includes any in-

___

**23.** Termination at the expiration and expired

by its own terms have been held to encom-

terest of a debtor as lessee under a lease that terminates by its terms after the commencement of the bankruptcy case. See P.L. 98–353, 1984 H.R. 5174. That for 11 U.S.C. § 365(c)(3) is:

\*　　\*　　\*　　\*　　\*　　\*

Section 365(c)(3) has been added to provide that the trustee may not assume or assign an unexpired non-residential lease if "such non-residential lease has been terminated under state law prior to the order for relief."

The purpose of this amendment is to provide that an *unexpired* non-residential lease may not be assumed by a trustee, if such lease has been *terminated* by a state court judgment or otherwise under state law prior to the order for relief.

S.Rep. No. 98–65 (1983) (emphasis added).

In addition to this legislative history (i) establishing the purpose of the 1984 amendments to §§ 362(b)(10), 365(c)(3), & 541(b)(2) to facilitate reletting of nonresidential real properties and (ii) revealing no intent to include pre-bankruptcy ended residential real property leases as either property of the estate or assumable, it demonstrates that the language used in the legislative history for the amendments adding subsections 362(b)(10), 365(c)(3), and 541(b)(2) treat "expired" as including within its definition "termination": "... where such lease has expired by its own

terms, i.e., because a specified *termination* date of the lease has been reached...." and "... an *unexpired* ... lease may not be assumed by a trustee, if such lease has been *terminated* ...." S.Rep. No. 98–65 (1983) (emphasis added). This is the opposite of the Moore–Daniels contention that an unexpired lease is one which has not been terminated. This is but one more aspect of why the plain meaning founded argument is incorrect. Thus, neither the plain meaning asserted, nor the maxim that exclusion of one evidences inclusion of the other offer the support urged by Daniels, Moore, and those cases on which they rely for these arguments such as *Talley*, *Yardley*, and *Morgan*.

(2) *The Glenn Foreclosure Analogy*

(a) *Derivation and Implementation*

The use of an analogy to the disposition of mortgaged real property at a foreclosure sale appears to have been modeled on a portion of *In re Glenn*, 760 F.2d 1428 (6th Cir.1985), in which the Sixth Circuit sets forth that "[t]he event we choose as the cut-off date of '... the statutory right to cure defaults is the sale of the mortgaged premises.'"[24] This mortgage foreclosure sale rule was adopted as one of general application within the Sixth Circuit. *In re Glenn*, 760 F.2d at 1435. This cut-off point was chosen based on various reasons, some policy, some not. One of

---

pass leases ended by a default based termination prior to a lease running to the end of its initially set term. *Robinson v. Chicago Housing Authority*, 54 F.3d 316, 320 (7th Cir. 1995) ("Hence we conclude that federal law draws no meaningful distinction between 'expired' and 'terminated' residential leases and does not provide greater federal protection for lessees under residential leases, the stated terms of which have not run, even though they have been otherwise terminated. Instead, the federal law allowing 'unexpired' leases to be assumed calls for a determination whether a lease has ended under state law.").

**24.** The reason that this appears to be the case is that *In re Talley*, 69 B.R. 219 (Bankr. M.D.Tenn.1986) and *In re Yardley*, 77 B.R. 643 (Bankr.M.D.Tenn.1987) were decided after *Glenn* and before the 1994 amendment to 11 U.S.C. § 1322 which added to what is now 11 U.S.C. § 1322(c)(1) which codifies in a fashion the *Glenn* treatment of foreclosure sales of real property. Act, P.L. No. 103–394, Title VII, § 702, 108 Stat. 4150 (Oct. 22, 1994).

the Sixth Circuit's panel's concerns was the variation between the laws of the jurisdictions within the circuit and a search for uniformity. The Sixth Circuit stated:

> In so ruling we avoid any effort to analyze the transaction in terms of state property law. Modern practice varies so much from state to state that any effort to satisfy the existing concepts in one state may only create confusion in the next. Thus, in construing this federal statute [to find the cut-off point before which one may cure defaults under a mortgage], we think it unnecessary to justify our construction by holding that the sale "extinguishes" or "satisfies" the mortgage or the lien, or that the mortgage is somehow "merged" in the judgment or in the deed of sale under state law.

*In re Glenn,* 760 F.2d at 1436.

At the time of the *Glenn* decision, this cut-off point was selected, at a minimum, arguably in derogation of the longstanding, federalistic in structure, analytical rule recited by the Supreme Court in *Butner* that property interests are created and defined by state law unless some federal interest requires a different result. *Butner v. U.S.,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136, 141–42 (1979). Since it was a generalized, one fits all rule set without reference to any state's laws, its use could cause a real property interest ended under state law before one files bankruptcy to be treated as "property of the estate." This would occur when the laws of a jurisdiction fix the ending of all of one's interests, both legal and equitable, in mortgaged real property at a place different than that selected by the Sixth Circuit in *Glenn.* When this happens, it also makes redemption of a real property inter-

est extinguished under state law pre-bankruptcy as if it was the curing of a default with respect to an interest in real property which existed under state law as of the filing of one's bankruptcy case. Depending on the type of foreclosure, private sale or by judicial decree, and on whether by statute the right of equitable redemption has been changed from what was its common law derivation, redemption may be under state law either (i) an interest in the realty which could be treated as the curing of a default for national bankruptcy law purposes, or (ii) a property interest separate from the real property where its exercise would not be the curing of a default.

Essentially, the *Glenn* rule for mortgaged property collapsed the potentially differing state law based places where one loses all interests, legal and equitable, in the mortgaged real property into one for use in all jurisdictions within the Sixth Circuit. At least until 1994, the difficulty with such a one rule for all cases was that if this rule does not reflect the legal status under one or more state's laws, it creates a context where bankrupt debtor-mortgagors are treated as having either greater or lesser property rights than similar, non-bankrupt, debtor-mortgagors who default. To the extent that the *Glenn* rule set the ability to cure a mortgage default at a later point than state law, it modified the state law founded property interests for a bankrupt-mortgagor making them greater than those of a nonbankrupt debtor-mortgagor residing in the same jurisdiction. Conversely and should the *Glenn* fixed point cut off the ability to cure be before what state law allows, it shrinks the bundle of property interests of a bankrupt-debtor vis-a-vis what a nonbankrupt debtor-mortgagor who defaults.[25]

---

**25.** In one state within the Sixth Circuit and for nonjudicial foreclosure sales of realty, the right of equitable redemption terminates upon the sale of the real property at foreclosure. *Gerasimos v. Continental Bank,* 237 Mich. 513, 518–19, 212 N.W. 71, 73 (1927). Fol-

### (b) *Rebuffed Basis for Comparable Rule*

Although this differentiation wrought by the *Glenn* bright line rule for all such cases has become by later legislation an historical anecdote for mortgages involving a Chapter 13 case debtor, *Glenn's* rule making approach was structured precisely as another one rejected by the Supreme Court in *Butner*. *Butner* entailed resolution of a split among the Circuit Courts of Appeals. The Third and Seventh Circuits adopted a federal rule based on equity powers of a court that afforded mortgagees a security interest in rents pre-foreclosure even if a state's laws would not until the foreclosure. In contrast, five other Circuit Courts of Appeals had held that the existence of such a security interest in rents was to be determined by state laws. This created different outcomes in "title theory states" where the mortgagee has a security interest in rents without taking actual or constructive possession of the property versus other states which predicated a mortgagee's right to rents on obtaining actual or constructive possession.

*Butner*, 440 U.S. at 52–53, 99 S.Ct. at 916–17, 59 L.Ed.2d at 140–41.

In rebuffing the bright line, one rule for all jurisdictions approach adopted by the Third and Seventh Circuits, the Supreme Court used language with direct applicability to how (i) the *Glenn* court reached its ruling, and (ii) the analogous leasehold ending bright line rule was adopted using the *Glenn* methodology. The Supreme Court's words in relevant part were:

Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 5 L.Ed.2d 323 [(1961)]. The justifications

---

lowing the sale, Michigan by statute has a statutory redemption right for mortgagors. Mich. Comp. Laws § 600.3140 (2002); *Gerasimos*, 237 Mich. at 518–19, 212 N.W. at 73. See also, Note, 29 Mich. L.Rev. 757 (1930–1931). In another, Ohio, for foreclosures by judicial decree, the fixing of the end of equitable redemption is earlier than at the foreclosure sale: it is on entry of the decree of foreclosure. See, e.g., *Hausman v. City of Dayton*, 73 Ohio St.3d 671, 676–77, 653 N.E.2d 1190, 1194–95 (1995); *Ohio Dept. of Taxation v. Plickert*, 128 Ohio App.3d 445, 447, 715 N.E.2d 239, 240–41 (1998); *BCGS, L.L.C. v. Raab*, 1998 WL 552984 (Ohio Ct. App. 11th Dist.); *Wayne Savings & Loan Co. v. Young*, 49 Ohio App.2d 35, 37, 358 N.E.2d 1380, 1381–82 (9th Dist.1976). However, Ohio has a statutory redemption period under Ohio Rev.Code Ann. § 2329.33 (Anderson 2002) allowing redemption of mortgaged real property to occur from the time after the sheriff's sale, but before confirmation of the

sale. *Hausman*, 73 Ohio St.3d at 676, 653 N.E.2d at 1194; *Women's Federal Savings Bank v. Pappadakes*, 38 Ohio St.3d 143, 145–46, 527 N.E.2d 792, 794–95 (1988); see *Levin, Trustee v. Carney, Aud.*, 161 Ohio St. 513, 520, 120 N.E.2d 92, 97–98 (1954). The Ohio Supreme Court has also concluded that under Ohio's statutory redemption a mortgagor retains an interest in the realty until the confirmation of the foreclosure sale. *Hausman*, 73 Ohio St.3d at 676, 653 N.E.2d at 1194. This is unlike Alabama which has a post-foreclosure sale statutory redemption period of one year, Ala.Code § 6–5–248(b) (1993), which is expressly not an interest in the realty. Ala. Code § 6–5–250 (1993); See *Commercial Federal Mtg. Corp. v. Smith (In re Smith)*, 85 F.3d 1555, 1558 (11th Cir.1996). Thus, the state law ending points of all of a mortgagor's interests in realty are not the same among the states. In some, it is as of the sale. In others, it is later.

for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property. [Footnote omitted.]

The minority of courts which have rejected state law have not done so because of any congressional command, or because their approach serves any identifiable federal interest. Rather, they have adopted a uniform federal approach to the question of the mortgagee's interest in rents and profits because of their perception of the demands of equity. The equity powers of the bankruptcy court play an important part in the administration of bankrupt estates in countless situations in which the judge is required to deal with particular, individualized problems. But undefined considerations of equity provide no basis for adoption of a uniform federal rule affording mortgagees an automatic interest in the rents as soon as the mortgagor is declared bankrupt.

In support of their rule, the Third and Seventh Circuits have emphasized that while the mortgagee may pursue various state-law remedies prior to bankruptcy, the adjudication leaves the mortgagee "only such remedies as may be found in a court of bankruptcy in the equitable administration of the bankrupt's assets." *Bindseil v. Liberty Trust Co.*, 248 F. 112, 114 (3rd Cir.1917). [Footnote omitted.] It does not follow, however, that "equitable administration" requires that all mortgagees be afforded an automatic security interest in rents and profits when state law would deny such an automatic benefit and require the mortgagee to take some affirmative action before his rights are recognized. What does follow is that the federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee

is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued. This is the majority view, which we adopt today.

*Butner,* 440 U.S. at 55–56, 99 S.Ct. at 918, 59 L.Ed.2d at 141–42. This quotation highlights a flaw in the *Glenn* analysis: use of equity or generalized policy concerns such as the perceived need in uniformity of outcome by federal courts in different states in determining property interests is not, absent a sufficient federal interest to the contrary, licensed. Recognition of this analytical problem for what is the proper basis for a jurisdiction wide, one rule for all cases highlights the existence of an identical one created by use of an analogy to *Glenn's* methodology to fashion a generalized rule for all lease and leasehold endings.

In the context of mortgage foreclosures involving a Chapter 13 debtor, this potential disparate treatment was eliminated by the 1994 amendments to § 1322 of the Bankruptcy Code which added, among other subsections, what is now 11 U.S.C. § 1322(c) which provides:

Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law; and

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the

payment of the claim as modified pursuant to 1325(a)(5) of this title.

What this amendment does is make the national law, instead of state law, set the point at which a Chapter 13 debtor loses the ability to cure defaults with respect to mortgaged property. Effectively and consistent with that which was contemplated by the Supreme Court of the United States in *Butner* and *Barnhill,* a controlling national interest was identified by legislative action—not judicial decision—which (i) superceded contrary state laws on the ending point for curing defaults which of necessity would encompass the continued existence of some interest in mortgaged/liened real property, and (ii) may require a different result in some jurisdictions than state law would reach. See *Butner,* 440 U.S. at 54–55, 99 S.Ct. at 917–18, 59 L.Ed.2d at 141–42. It is more than noteworthy that during the over twenty-three plus years since the effective date of the Bankruptcy Code no comparable statutory change was wrought by legislative action creating a national law on when all residential leases and leasehold interests are ended.[26]

In the absence of a similar, explicit statutory change for residential real property leases constituting a debtor's principal residence, the use of a so-called analogous cut-off point setting rationale presents the same failure to differentiate between that which ended pre-bankruptcy versus that which was a property interest under state law on one's commencement of a bankruptcy case. It disregards the *Butner, et al.* principle of reference to state law for what

interests in property a debtor held by making one point the only one for determining when a lessee no longer holds any interest in a leasehold estate. It thus modifies by judicial decision in many cases what state law sets as the ending of all interests in such residential real property leaseholds.

### (c) *Seminal Bankruptcy Cases at Variance with Underlying State Law*

Some of the seminal cases which use the *Glenn* mortgage cut-off rule as the source of the analogy for selection of the point at which a residential lease of real property becomes expired for § 365(a) purposes include *In re Yardley,* 77 B.R. 643, 644–45 (Bankr.M.D.Tenn.1987); *In re Talley,* 69 B.R. 219, 224–25 (Bankr.M.D.Tenn.1986) (fixing execution of writ of possession by service on the tenant as the only "measurable [and] identifiable" point for the termination of the landlord-tenant relationship under Tennessee law and holding the residential lease not "expired" until the occurrence of the service of the writ of possession); *In re Shannon,* 54 B.R. 219, 220 (Bankr.M.D.Tenn.1985) (same point selected and citing to unpublished decision of *Smith v. Morrese Karr Realty Co.,* Case No. 380–01112, Adv. Pro. No. 380–0323 (Bankr.M.D.Tenn.1980) for the same lease ending proposition). Since each of these cases is from Tennessee, a review of Tennessee's laws on ending of leasehold estates demonstrates the problem inherent in this one rule fits all approach for residential leases of real property.

---

**26.** There is one caveat to this legislative fact. A lessor, as a lender might, could use a mortgage to secure a lessee's obligations under a lease and all or part of the collateral securing performance via use of a mortgage could include the lessee's leasehold estate. For a Chapter 13 debtor who had as his principal residence leased real property subject to a mortgage, 11 U.S.C. § 1322(c) would encompass the cure of a default under the mortgage for a leasehold estate. However, such a use of a mortgage by a lessor would, most likely, be very infrequent, if ever. Also, the lessor in such an instance is not likely to terminate the lease pre-foreclosure.

Examination of opinions of the Supreme Court of Tennessee establishes that different rules for the "expiration" of residential leases have existed for Tennessee leasehold interests. Although in 1975 Tennessee enacted its version of the Uniform Residential Landlord and Tenant Act (URLTA), Tenn.Code Ann. §§ 66–28–101 *et seq.* (2001), it is applicable for lease termination governing purposes in only some Tennessee counties. Tenn.Code Ann. § 66–28–102 (2001); see *Crawford v. Buckner*, 839 S.W.2d 754, 755 (Tenn.1992). In part, it is the URLTA's geographical limits on applicability which causes termination of residential leases in some counties to be governed by the same Tennessee laws applicable to nonresidential leases.

Like other states which have a common law founded legal system and early in Tennessee's existence as a state, it enacted an unlawful detainer statute to avoid, among other things, violence between a landlord and tenant which often occurred when a landlord attempted to end the tenant's estate, i.e., cause forfeiture of the leasehold estate to be effective. Prior to the 1821 enactment of the first unlawful detainer statute in Tennessee, and to enforce forfeiture of a leasehold which marked the end of the landlord-tenant relationship and extinguished the tenant's interest in the estate conveyed by a lease, the lessor had to re-enter or take possession of the leased property from the lessee. *The Cain Partnership, Ltd. v. Pioneer Investment Services Co.*, 914 S.W.2d 452, 456–58 (Tenn. 1996); *Matthews v. Crofford*, 129 Tenn. 541, 167 S.W. 695, 698–99 (1914).

This common law rule was modified by the enactment of unlawful detainer. The Tennessee Supreme Court has repeatedly recognized that it is the commencement of an action for unlawful detainer which is the legal substitute for personal entry or retaking of the leasehold premises by a landlord. *The Cain Partnership*, 914 S.W.2d at 463–64; *Matthews*, 167 S.W. at 698. For enforcing forfeiture of a lease, re-entry has been held to be on the service of process of the unlawful detainer suit—not execution of the writ of possession. For over a century, Tennessee law has not required the physical retaking of leased property in order to end every landlord-tenant relationship and the estate conveyed by the lease. *Matthews*, 167 S.W. at 698; see *The Cain Partnership*, 914 S.W.2d at 463–64. Thus, the *Talley, et al.* adopted one rule for all residential lease endings has not been and is not Tennessee law for when all residential leases and all residential leasehold interests are ended.

For some, it is on service of the complaint in an unlawful detainer action. *Matthews*, 167 S.W. at 698; see *The Cain Partnership*, 914 S.W.2d at 463–64. For others, the ending of the leasehold interest and lessor-lessee relationship may be earlier. This arises from the Tennessee Court's enforcement of contract terms selecting an ending point such as on the giving of notice of a default where such a default is by contract a basis for ending the lease and estate conveyed. See *The Cain Partnership*, 914 S.W.2d at 459 (In rejecting the continuation of common law rules for terminations of nonresidential leases involving one which did not expressly make nonpayment a basis for termination, Tennessee Supreme Court (i) adopts the view that " . . . parties' rights and liabilities should turn on an interpretation of the lease, the conduct of the parties, and rules which are consistent with modern business practice", (ii) makes the Restatement of Property (Second), § 13.1 (1977) applicable to commercial leases, and (iii) allows termination of leases not containing language making nonpayment of rent a basis for termination on the passage of a reasonable time following notice of demand within which to pay or vacate.);

see also, *In re Memphis–Friday's Associates,* 88 B.R. 830, 834–37 (Bankr. W.D.Tenn.1988). Effectively, the Tennessee Supreme Court has recognized that in many Tennessee lease terminations it is a legal fiction that re-entry or taking of possession is required before termination of a lease is effective. The result is that any argument predicated on the abandoned concept of the necessity of a lessor's physical re-entry/taking of possession for all lease/leasehold terminations is no longer utilizable to demonstrate that absent such an event a lessee's leasehold estate interests are not ended.

To similar effect is the Tennessee Supreme Court's interpretation of its URLTA. Under the URLTA, the ending of a residential lease for material noncompliance, including nonpayment of rent, is effective upon the expiration of the advance notice period without payment of rent arrears even if the lease does not have wording expressly reserving the right to terminate the lease. See *The Cain Partnership,* 914 S.W.2d at 457–58.

What is demonstrated by a reading of *The Cain Partnership* is the evolution in Tennessee of how one ends the landlord-tenant relationship and a tenant's interest in any estate of real property conveyed. It has been to make the process easier and earlier—frequently by contract much earlier—than the point of physical retaking of possession of the leasehold estate by a lessor from the lessee. Thus under Tennessee law, the ending of a lease will vary by the terms of the contract and the applicable facts and law. Of necessity, this means the moment of the ending of the lease and leasehold estate will not be the same for all leases and leaseholds. The corollary is that adoption and use of one rule for all residential lease terminations may either expand or contract the property interests of a bankrupt-lessee from what *Butner, Barnhill,* and their progeny have held as the means for ascertaining what property interests a bankrupt debtor held as of filing bankruptcy.

The point of this discussion of Tennessee law is not to assert that the general rule espoused in *Talley* and *Yardley,* and other cases within Tennessee and outside Tennessee, like *Morgan,* following this so-called bright line rule for application to all residential lease cases is always incorrect. Rather, it is to point out that in the absence of a clear and unequivocal statement of federal law mandating a different result such as that evidenced by the statutory change wrought for mortgaged residential real property interests by the 1994 amendment now set forth in 11 U.S.C. § 1322(c), the extension of the mortgage analogy argument to leases causes a similar problem in the leasehold arena to that created at the time of the *Glenn* decision. The error for leasehold estates is the same as that which existed until 1994 for mortgaged interests of real property: expansion or contraction of a debtor's property interests from those held under state law by use of a judicially created one rule fits all approach.

In those cases in Tennessee and elsewhere which adopt either the execution of a writ of restitution, see, e.g., *In re Morgan,* 181 B.R. 579 (Bankr.N.D.Ala.1994), or execution of the writ of possession following entry of judgment in an unlawful detainer action, see, e.g., *In re Talley,* 69 B.R. 219 (Bankr.M.D.Tenn.1986), as *the* point where all of a residential lessee's property interests are ended for assumption purposes under 11 U.S.C. § 365(a) & (d)(2), and where under state law these interests ceased to exist pre-bankruptcy at an earlier point, no interest in property constituting a residential lease would exist under state law. Yet, *Talley* in Tennessee, *Morgan* in Alabama, and their followers

must find an interest in real property which becomes "property of the estate" under § 541(a) before any residential lease of real property could be assumed under § 365(a) & (d)(2). This has been done via the *Glenn* type reasoning by a judicially generated general rule for all cases implemented via a national law, the Bankruptcy Code, which pushes in many instances the lease/leasehold estate ending point well beyond where state law fixes it so a lease and leasehold property interest may be said to exist for bankruptcy "property of the estate" purposes. This sort of use of a *Glenn* based analogy is inconsistent with the longstanding principle that state law defines the property interests a debtor possesses on filing bankruptcy, and how the Supreme Court has viewed in *Butner* use of a jurisdiction wide rule without a clearly articulated national interest supporting such a deviation from the now decades old manner of ascertaining what property interests a debtor held on the commencement of a bankruptcy case.

### (d) *The Missed Analogy– Making it Complete*

Additionally and not addressed in *Talley–Yardley–Morgan, et al.* is that as part of its ruling, the *Glenn* panel rejected (i) the later point of the running of the post-foreclosure sale statutory redemption period, and (ii) attempts by the Chapter 13 debtors to alter the state law post-foreclosure statutory redemption requirements by either (a) extending the time frame for redemption and/or (b) paying the redemption sum over time through a Chapter 13 plan. *In re Glenn*, 760 F.2d at 1436–43. More simply, the cure of a mortgage default was not permitted after what the *Glenn* court set as the last possible point where a mortgagor could cure a default: where the real property interests were acquired by another, be it the mortgagee or a third party. Contrary to what *Glenn* mandates under its holding for post-fore-

closure sale mortgage redemptions, this part of *Glenn* is disregarded by many of those courts which by analogy to *Glenn* adopt a supposedly similar rule for lease endings.

Absent an expressed contract provision selecting it as the ending point for a lessee's lease contract and leasehold estate interests, the state law based leasehold possessory interest extinction point is in Alabama and Tennessee before the post-judgment issuance, and/or service, and/or execution of a writ of possession or a similar order. Just where may change case by case. Whether it is the service of the unlawful detainer suit or at another point fixed by statute or contract, the tenant's loss of the leasehold estate is fixed and certain. Varying by case, it may be along the progression from when one of these is reached: the contract agreed upon point, the statutorily prescribed notice is effective, the service of the unlawful detainer suit, or the physical re-entry of the premises. When re-entry is accomplished, physically or by a legally recognized substitute, or where legally no longer required, no lease and no possessory interest in real property by a tenant *under the lease exists*. To be consistent with *Glenn*, it is this point, once reached, where by analogy to *Glenn's* mortgage foreclosure rule that the ability to cure a default under a residential lease of real property ends under state law.

For one following the *Glenn* rationale and after the point of loss of all legal and equitable interests in leased residential real property, the lessee's ability, just as the mortgagor's following sale of the real property interest, to obtain relief from the loss of the real property interest is governed by the state law available remedies for relief from forfeiture. It is no longer necessarily the curing of a default. See,

e.g., *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1469–71 (9th Cir.1988); *In the Matter of Escondido West Travelodge*, 52 B.R. 376, 379–80 (S.D.Cal.1985); *In re Smith*, 105 B.R. 50, 53–54 (Bankr.C.D.Cal.1989). Despite this aspect of what the *Glenn* analogy argument should provide, *Talley*, *Yardley*, and their progeny select a point which for Tennessee is, in many instances, *after* the ending of the landlord-tenant relationship and the possessory interest of the tenant in the leased property. Likewise, the same happens in Alabama for many terminated leases when the *Morgan* holding is universally followed.

### (e) *Equitable Redemption vs. Equity's Antiforfeiture*

Discussion of an error implicit in the *Glenn* mortgage foreclosure rule when adopting a similar one by analogy for leases would be incomplete without mention of the right of equitable redemption for mortgages and the counterpart for leases. It also leads into the consideration of misapplication by some courts of the Ninth Circuit's holding in *In re Windmill Farms, Inc.*, 841 F.2d 1467 (9th Cir.1988).

The purpose of the mortgagee's exercise of equitable redemption has been to forestall the foreclosure sale which, in states like Alabama allowing private foreclosure, marks the end of all of the mortgagor's interests in the real property. *Gerasimos*, 237 Mich. at 518–19, 212 N.W. at 73; *Summerford v. Hammond*, 187 Ala. 244, 65 So. 831 (1914); *Federal Deposit Ins. Corp. v. Morrison*, 747 F.2d 610, 613 (11th Cir.

1984); *In re Greene*, 248 B.R. 583, 607 (Bankr.N.D.Ala.2000). In jurisdictions utilizing judicial foreclosure, the loss of the right of equitable redemption differs. It may be at the entry of the decree of foreclosure. See *Hausman*, 73 Ohio St.3d at 676, 677, 653 N.E.2d at 1194–95. It may be by a statutory substitute for the right of equitable redemption on the issuance of the certificate of title by the clerk of the court or, if an objection to the sale, confirmation of the sale, or other date set by court order. Fla. Stat. ch. 45.0315 (1994). See *Hoffman v. Semet*, 316 So.2d 649, 652 (Fla.Dist.Ct.App.1975); *John Stepp, Inc. v. First Federal Savings & Loan Assoc. of Miami*, 379 So.2d 384, 386 (Fla.Dist.Ct.App.1980). The historical comparable for leases in many states is tender of payment of what is owed, accrued rent at a minimum, to preclude the forfeiture of the estate conveyed. See *Humphrey v. Humphrey*, 254 Ala. at 399, 48 So.2d at 427; *City Garage & Sales Co.*, 214 Ala. at 518, 108 So. at 259; *Rader v. Prather*, 100 Fla. 591, 595, 130 So. 15, 17 (1930); *Baker v. Clifford–Mathew Inv. Co.*, 99 Fla. 1229, 1232–34, 128 So. 827, 829 (1930). Just as foreclosure with respect to the real property ends equitable redemption in many jurisdictions, the loss by forfeiture of the leasehold estate ends the common law right to stop the forfeiture by a pre-termination tender of unpaid, accrued monies owed under a lease.[27] *Matthews*, 167 S.W. at 699; *City Garage & Sales Co.*, 214 Ala. at 518, 108 So. at 259. See *In re Windmill Farms, Inc.*, 841 F.2d

---

**27.** Some jurisdictions have modified the right of equitable redemption by statute. Post-foreclosure sale redemption is provided for in some by statute. This post-foreclosure redemption is often referred to as statutory redemption. When reviewing a state's statutes, it is important to see whether the statute is a modification of the right of equitable redemption under which a mortgagor retains an interest in the real property or whether it re-

places or supplements equitable redemption and is not an interest in the mortgaged realty. The difference is that under one, equitable redemption, the mortgagor retains an interest in the real property, and under the other, statutory redemption, the mortgagor does not unless the statute or jurisdiction's laws for statutory redemption define it as an interest in the realty subject to redemption.

1467, 1469–72 (9th Cir.1988). Tennessee's Supreme Court held this to be the case no later than 1914 in an opinion containing these words "[n]or is it true that the tender which was made with the filing of the petition for writs of certiorari and supersedeas [to stop enforcement of a writ of possession after lease termination] availed to destroy the forfeiture." *Matthews,* 167 S.W. at 699. So too, for Alabama's Supreme Court. See *City Garage & Sales Co.,* 214 Ala. at 518, 108 So. at 259.

The loss of the pre-forfeiture cure right as of termination of a leasehold in Tennessee, just as in Alabama, is why the summary in *Talley* of its mortgage foreclosure analogy is flawed for use as a general rule applicable to all residential lease terminations. The summation paragraph is:

> Like the foreclosure sale of mortgaged property, the dispossession of a tenant from leased property is at the heart of the realization of a judgment for unlawful detainer under Tennessee law. Only then—upon execution of the Writ of Possession—is the termination of the landlord tenant relationship "measurable [and] identifiable." Prior to that time, the tenant has many and varied rights to upset the landlord's intent to reacquire the leasehold. Execution of a writ of possession is the one step in the process that has certainty in all counties and in all contractual situations. It is the point in time at which the process of the law physically severs the debtor from the tenancy. For purposes of application of a Chapter 13 debtor's right to cure default and maintain payments under a residential lease, I find that the lease is not "expired" until execution of the Writ of Possession by service upon the tenant.

*Talley,* 69 B.R. at 225.

*Talley* equates the ending of all a lessee's interests in the leasehold estate for all Tennessee residential leases—termination of the landlord-tenant relationship—to execution of a writ of possession. That is, the point in time when a tenant is to be physically removed from real property. As evidenced by the discussion of Tennessee law, this has not been Tennessee law for all leases and has been expressly rejected by Tennessee's Supreme Court. *Matthews,* 167 S.W. at 699.

This sort of argument is one which means that a lease and leasehold estate may never be ended until not just a final judgment issues upholding a lessor's ending of a lease, but also a later post-judgment writ of possession is executed on a recalcitrant former lessee who will not voluntarily leave the residential realty. It is one premised on the concept that one may not contract to end a lease without a court's judgment and issuance of a post-judgment enforcement order. It is one which grants status to defenses to the termination, including nonmeritorious ones, for why a lease and possessory rights thereunder are not ended by allowing such matters to equate to the inability to end a lease and leasehold estate. That a court order upholds a lessor's termination of a lease does not mean that a lessor's earlier—sometimes given the slowness of the legal system, much earlier—termination was not effective at the earlier date. Indeed, the obverse is the usual legal state when a court upholds a lessor's pre-lawsuit ending of the landlord-tenant relationship. It is the *Talley* assumption that when a lease is ended it is always merged in time with issuance of a final judicial determination upholding this status. In fact, this is often not so. *In re Williams,* 144 F.3d 544, 548–49 (7th Cir.1998); *In the Matter of Escondido West Travelodge,* 52 B.R.

376, 379 (S.D.Cal.1985).[28] Essentially, this difficulty in the *Glenn* type mortgage foreclosure analogy for leases is that it overlooks in jurisdictions such as Tennessee and Alabama the evolution of how leases and leasehold estates may be ended and does not recognize that the loss by a lessee of physical possession of the leased property is no longer necessary or required under state laws in all instances to end all lessee interests in the residential real property.

### (f) The Unsupported Extrapolation

As telling for why it is a generalization not applicable to all lease-leasehold estate endings is that it is an extrapolation beyond what even *Glenn* and 11 U.S.C. § 1322(c)(1) encompass. Neither the *Glenn* developed rule for curing defaults with respect to residential realty securing a debt, nor the § 1322(c)(1) version of the last point in a Chapter 13 case after which a debtor may no longer cure a mortgage default is fixed at the point where, post foreclosure sale a court order is needed to have the mortgagor taken off the sold property. As with many leasehold endings, the *Glenn* rule and § 1322(c)(1) do not predicate the right to cure a mortgage default on the presence of the mortgagor on the residential real property, i.e., possession.[29] Having set forth what this Court sees as the major flaws in the *Glenn* mortgage foreclosure analogy rule for leaseholds, what is left for this part of this opinion is consideration of the last of the deconstruction methodologies: statutory and equitable post-termination relief from forfeiture of leaseholds.

### (3) The Antiforfeiture Sine Qua Non

From a debtor-lessee's standpoint, the mortgage foreclosure analogy espoused in *Talley, Yardley, Morgan*, and courts adopting this type of rule to achieve assumability pushes the ending of the possessory interest arising under a lease to almost the farthest extreme. Because of this, some leases, though non-existent under state law, are considered not ended for § 365 assumption purposes. This transmogrification is sometimes coupled with the altering of what under state law are post-termination relief from forfeiture preconditions into the curing of a default. This is due to this method's conclusion that the lease is not ended. What it does is evades consideration of the second part of the *Windmill Farms* lease termination analysis which is whether the termination of the lease can be relieved under the jurisdiction's laws.

Similar to Alabama's case law treatment of a tenant who may prevent forfeiture of a lease by tendering past due sums before the leasehold interest is ended, some states by statute and its equity courts' rulings have in limited circumstances granted post-termination relief from forfeiture of a leasehold. It is the existence of statutory and/or equitable relief from the ending of a lease and a tenant's possessory interest which is the linchpin of how some courts believe that a leasehold ended under state law pre-bankruptcy is "unexpired" for § 365(a) & (d) purposes.

---

**28.** When taken literally, the *Glenn* mortgage analogy argument as applied by *Talley, Yardley, Morgan* and others means a lease and leasehold estate is "unexpired" for 11 U.S.C. § 365(a) & (d)(2) assumption determination where a lessor properly terminates the lease under state law, the lessee voluntarily vacates the premises, and a writ of execution in an unlawful detainer or similar purposed suit is never sought!

**29.** Indeed, the Seventh Circuit has recently held the § 1322(c)(1) cure right ends on the sale of the realty at foreclosure, not completion of the sale, confirmation of the sale, or transfer by the deed. *Colon v. Option One Mortgage Corp.*, 319 F.3d 912 (7th Cir.2003).

One such case is *Executive Square Office Building v. O'Connor and Associates, Inc.,* 19 B.R. 143 (Bankr.N.D.Fla.1981). In *Executive Square,* the court determined that a commercial lease had been terminated under Florida law pre-bankruptcy. However, it concluded that if the termination of a lease may be reversible by a state's antiforfeiture statute or resort to similar equitable relief, the terminated lease may be assumed. *Executive Square,* 19 B.R. at 146. The court's words are:

> If extinguishment of lease interest is still subject to existing and available statutory grace proviso or right to resort to equity to prevent forfeiture or termination, there has not been any "ultimate or final termination" for purpose of analyzing whether Bankruptcy Court has initial jurisdiction, whether automatic stay is applicable, and whether provisions of statute authorizing trustee to assume and undertake to cure lease are applicable.

*Executive Square,* 19 B.R. at 146.

One should note that this language indicates use of these antiforfeiture relief bases as if the lease had not already been ended under Florida law which was not the fact situation in *Executive Square.* Then the *Executive Square* court holds that the Florida statutory antiforfeiture requirement of payment of accrued, unpaid rent within the time required had not been met by the lessee. This statute did not, therefore, allow the lessee relief from the ending of the lease. Next, the court looked at Florida's equity based relief from forfeiture of a leasehold, established that this law made as a condition precedent to relief the payment of rent arrearages, and recognized that absent such a payment no relief from a forfeiture is granted by Florida's courts irrespective of the equities that may exist. *Executive Square,* 19 B.R. at 148. Despite this understanding of Florida law,

the *Executive Square* court goes on to hold that § 365 of the Bankruptcy Code, 11 U.S.C. § 365, allows what Florida treats as a pre-condition to relief from the forfeiture of a leasehold to be merely the curing of a default making "... an immediate cure of arrearage or a tender thereof ... no longer absolutely required provided 'adequate assurance' for the same is made in accordance with § 365." *Executive Square,* 19 B.R. at 148.

Although the court did not allow assumption in *Executive Square* by finding the debtor failed to demonstrate the ability to furnish adequate assurance of future performance under the lease, two of the bankruptcy court's *dictum* conclusions are the quintessence of how it reaches assumption of a leasehold interest ended under state law may be accomplished. They are its determination that the existence of the possibility, absent proof, of either statutory or equitable relief from the termination of a lease is sufficient to make the lease "unexpired" for § 365 assumption purposes and its treatment of Florida's pre-condition to the award of such antiforfeiture relief, payment of all rent arrears, as merely the curing of a default. This *Executive Square* methodology is how other courts have found a lease ended under state law pre-bankruptcy "unexpired" for assumption under 11 U.S.C. § 365. Some of the other federal courts in Florida following this *Executive Square* rationale for why a leasehold ended under state law remains unexpired for § 365 assumption are *Ross v. Metropolitan Dade County (In re Ross),* 142 B.R. 1013, 1014–15 (S.D.Fla. 1992), and *In re Atkins,* 237 B.R. 816, 818–19 (Bankr.M.D.Fla.1999).

What is being done in *Executive Square, Ross,* and *Atkins* is that no proof is required to show that the debtor-tenant could come within what is required by Florida's case law developed equity relief

from an accomplished forfeiture. *Executive Square Office Building v. O'Connor and Associates, Inc.,* 19 B.R. 143 (Bankr. N.D.Fla.1981); *In re Ross,* 142 B.R. 1013 (S.D.Fla.1992); *In re Atkins,* 237 B.R. 816 (Bankr.M.D.Fla.1999). It is just the existence of Florida's courts having a body of case law allowing, on limited occasions, equitable relief from a terminated lease which is the justification for why the debtor's leasehold is "unexpired" under § 365. Nothing more of the debtor is necessitated. This conflicts with the fact that Florida's courts do not grant equitable relief from the forfeiture of a leasehold interest based on merely the potential that a lessee might meet the case law developed prerequisites.

What is actually necessitated under Florida law post-termination of a lease ended for nonpayment of rent is, at a minimum, payment of the rent arrears plus interest. When the basis is other than nonpayment of rent and fraud, accident and/or mistake are not involved, Florida's courts do not use their equity powers to avoid forfeitures. *Rader v. Prather,* 100 Fla. 591, 596–97, 130 So. 15, 17–18 (1930). The *Rader* court cited Florida precedent for relief from a forfeited leasehold also evidences that Florida's precondition to relief from forfeiture for nonpayment of rent where the amount owed is not disputed is the lump sum tender of the amount of rent arrears *plus more.* The more is no less than interest on the arrears.

Further analysis of *Rader's* facts indicates that the more may also require a finding of unjust enrichment of a landlord such as when a tenant makes valuable improvements and there is disproportionate harm to the tenant by loss of the improvement. *Rader,* 100 Fla. at 592–598,

130 So. at 16–18. The *Rader* court additionally recognizes that a lessee's gross negligence and willful persistent violation of the lease's terms may be a bar to equitable relief from an ended leasehold estate. *Rader,* 100 Fla. at 597–98, 130 So. at 18. A summary of Florida's equity based grant of relief from forfeiture of a leasehold estate is that it is not automatic even upon the tender of rental arrearages. Its requirements are also virtually identical to Alabama's. See III.(4) Relief or Not—The Antiforfeiture Progression, *supra.*

The point of the discussion of this Florida authority is that just the existence of equitable relief from forfeiture of a leasehold has not been the basis for the granting of such relief by its courts. They have required compliance with the pre-condition of payment of rent arrears plus, at a minimum, interest as a measure of the landlord's damages. Contrary to Florida's state courts' implementation of relief from forfeited leaseholds, *Executive Square, Ross, Atkins* and other courts following their methodology disregard the fact that the state law on relief from forfeiture treats such leaseholds as already having been ended and that the price for undoing the forfeiture is immediate payment of all rental arrearages plus the more factors.

They also do not address whether Florida's post-termination forfeiture equity based relief is an interest separate and distinct from the no longer existent lease and estate conveyed. Further, these courts fail to point out why each treats meeting the conditions to relief from the accomplished ending of a leasehold estate no different under bankruptcy law than that for complying with what is available to a mortgagor before the point of loss of all interests in the liened realty.[30] That is,

---

**30.** Florida uses judicial foreclosure for mortgages and deeds of trust. Fla. Stat. ch.

802.09 (1994). A mortgagor's redemption of realty is governed by Fla. Stat. ch. 45.0315

why is getting back what is already lost under Florida's law, a lease, treated as merely the curing of a default which is the same as that required for preventing the loss of mortgaged realty?

The antiforfeiture equitable remedy is a way to get back interests in leased real property which is the whole or a part of the realty for less than all time. It is a limited remedy exercisable only after the ending of all one's interests in the real property. Yet, *Executive Square, Ross, Atkins*, and their methodology followers treat relief from pre-bankruptcy ended residential leasehold interests different from and inconsistent with Florida's statutory redemption which inherently requires that a mortgagor have retained an interest in the realty.[31] Why this disparate treatment is accorded leased and not mortgaged realty interests is not discussed by these courts.

Combined with these problems, *Ross* relied in reaching its "unexpired" conclusion on *Talley's In re Glenn* mortgage foreclosure analogy, *Ross*, 142 B.R. at 1015, and a misinterpretation of the second part of the *In re Windmill Farms, Inc.*, 841 F.2d 1467 (9th Cir.1988), procedure for determining whether the forfeiture of a lease could be

reversed. The same is true for *Atkins*. Although *Atkins* cites *Glenn*, it does not mention *Windmill Farms*. Its reliance on the misinterpretation of *Windmill Farms* is via its citation to that portion of *Ross* which misapplies the second part of the *Windmill Farms'* two part method to ascertain if a lease is expired. See *Atkins*, 237 B.R. at 819.

The *Ross* court and the *Atkins* court by reliance on *Ross*, read the second prong of the two part analysis that seeks to determine assumability of a lease by finding "... whether the termination could have been reversed under a state antiforfeiture provision or other applicable state law," *In re Windmill Farms, Inc.*, 841 F.2d at 1472, as meaning that all that need be found is a state law which may or may not grant relief from the forfeiture of a lease. Supposedly, no proof that the tenant meets the state law standard is needed.

A close review of *Windmill Farms* dispatches this *Ross–Atkins* reading. It also highlights the error in the identical position taken in *Executive Square*. First, the *Windmill Farms* court sets forth while discussing the trustee's ability to assume the lease at issue that "[i]f so [entitled to

---

(1994) which effectively codifies redemption rights and provides "... there is no other right of redemption." It allows a mortgagor to redeem foreclosed realty until the later of the clerk of the court filing a certificate of sale or other date set by the court. Fla. Stat. ch. 45.0315.

One Florida District Court of Appeals has held the redemption right "... continues to exist until the foreclosure sale has been confirmed by the court, or if no objection, then until issuance of the certificate of title." *John Stepp, Inc. v. First Federal Savings & Loan Association of Miami*, 379 So.2d 384, 386 (Fla.Dist.Ct.App.1980). This is potentially a later date than filing of the certificate of sale or other date set by the Florida court.

This mortgage redemption statute has been recognized by Florida's courts as encompass-

ing the mortgagor's equity of redemption and constituting an estate in land. See *Hoffman v. Semet*, 316 So.2d 649, 652 (Fla.Dist.Ct.App. 1975); *Wildwood Crate & Ice Co. v. Citizens Bank of Inverness*, 98 Fla. 186, 123 So. 699, 702 (1929); *Indian River Farms v. YBF Partners*, 777 So.2d 1096, 1099 (Fla.Dist.Ct.App. 2001); *John Stepp, Inc.*, 379 So.2d at 386. The import of all of this is that until the statutory set forth redemption is ended, a mortgagor retains in Florida an interest in the realty. Also, redemption is no longer available once the mortgagor has no interest in the realty.

**31.** See discussion of Florida mortgage foreclosure and redemption set forth in footnote 30 *supra*.

relief from forfeiture under California's law], the trustee's assumption of the lease would be proper." The Ninth Circuit panel wrote further that:

This second step in the analysis "permits the [trustee] the same opportunities to avoid forfeiture of a lease ... that it would have received under state law absent the bankruptcy proceedings." [See *City of Valdez v. Waterkist Corp. (In re Waterkist Corp.)*, 775 F.2d 1089, 1091 (9th Cir.1985) ] (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)). On remand the bankruptcy court should *determine* whether the lease, if validly terminated by Vanderpark, could have been saved from forfeiture by application of California Code of Civil Procedure section 1179, or any other antiforfeiture provision of California law.

*In re Windmill Farms, Inc.*, 841 F.2d at 1472 (emphasis added).

The Ninth Circuit sent back the *Windmill Farms* case to the lower court to make a determination that the factors mandated for relief from a lease's forfeiture by California's antiforfeiture remedies could, in fact, be met by the trustee. This is precisely what *Ross* and *Atkins* do not require. It is also what the *Executive Square* analysis, which both *Ross* and *Atkins* rely on, does not mandate. Yet, *Windmill Farms* evidences the necessity of compliance with a state's laws for relief from forfeiture. This is made plainer by reference to the prior case in which the two part test for lease assumptions was first detailed by the Ninth Circuit, *City of Valdez, Alaska v. Waterkist Corp. (In re Waterkist)*, 775 F.2d 1089, 1091 (9th Cir. 1985). The *Waterkist* opinion not only contains that for a lease to be assumed one "... must determine whether the termination could have been reversed ..."—not

might have been, but also refers for this proposition to the cases of *In re Burke*, 76 F.Supp. 5, 8 (S.D.Cal.1948); and *Hazen v. Hospitality Associates (In re Hospitality Associates)*, 6 B.R. 778, 780 (Bankr.D.Or. 1980).

A review of *Burke* discloses terms of the grant of relief from forfeiture in a Bankruptcy Act case under a California statute that required payment of unpaid rent arrears plus a finding of hardship. The payment of rent was done plus an undisputed finding of hardship was made by the lower court. *In re Burke*, 76 F.Supp. at 8. The same is shown by a relied upon Bankruptcy Code case, *Hospitality Associates*. The *Hospitality Associates* court set forth the Oregon standard for relief from forfeiture for failure to pay rent:

Relief from the forfeiture of a lease for failure of the lessees to pay an installment of rent within the time stipulated in the lease has been granted in Oregon in *limited circumstances* on the basis of accident or mistake in *Caine [v. Powell*, 185 Or. 322, 202 P.2d 931 (1949)], supra, or for excusable neglect in *Moore [v. Richfield Oil Corp.*, 233 Or. 39, 377 P.2d 32 (1962)], supra. Relief on the basis of the affirmative defense of estoppel was recognized in *Washington Square [v. First Lady Beauty Salons*, 43 Or.App. 269, 602 P.2d 1083 (1979)], supra, and *although tender of the delinquent rental payments is a necessary concomitant to obtaining relief, such tender is not a basis for equitable defense absent other equitable basis for relief such as fraud, mistake or estoppel.*

*Hospitality Associates*, 6 B.R. at 782 (emphasis added) (citing *Fry v. D.H. Overmyer Co., Inc.*, 525 P.2d 140, 150, 269 Or. 281, 303–04 (1974)). One should also take note that Oregon law, as that of California

in *Burke*,[32] calls for meeting the precondition of tender of payment *plus more*. Under the California statute, the "plus more" was a finding of hardship. In Oregon, the "plus more" includes accident, mistake, excusable neglect, or estoppel. The court in *Hospitality Associates* concluded that the record in the case did not support a finding of fraud, mistake, estoppel, excusable negligence or accident for relief from the pre-bankruptcy termination of the lease. *In re Hospitality Associates*, 6 B.R. at 782. In other words, the bankruptcy court looked for proof sufficient under Oregon's equitable relief from forfeiture laws to demonstrate that the debtor-lessee was entitled to such equitable relief, did not find a "plus more" factor, and, as a result, the lease was not assumable under 11 U.S.C. § 365.

The gist of this discussion of but a few of the cases employing the mere existence of either statutory or equitable relief from an accomplished pre-bankruptcy forfeiture without compliance with the state law founded requirements for such relief is that more is required in many states and by the national law on bankruptcy. Why this is so is that not following what state law requires for relief from the ending of a leasehold interest expands in some jurisdictions what *Butner* and its successor, following opinions demand for finding property a debtor possessed—in these instances a lease and leasehold estate—and whether it is "property of the estate" under 11 U.S.C. § 541. Again, this failure to comply with the *Butner, et al.* methodology causes inclusion within "property of the estate" interests which ceased to exist under state law as of the bankruptcy demarcation date and time. The failure arises from lack of consideration for how state law treats either or both, if they exist in a jurisdiction, a statutory or equity based antiforfeiture remedy for relief from a pre-bankruptcy accomplished ending of a lease-leasehold estate.

Under Alabama's laws, there are no statutory or case law authorities which treat its post-termination equitable relief as an interest comprising even a portion of lease or leasehold estate. This relegates this equitable remedy to a separate and distinct interest includible as property of the estate, but not as a lease. Cf. *Wilson v. Bill Barry Enterprises, Inc.*, 822 F.2d 859, 861 (9th Cir.1987). It is to be treated comparable to how the Eleventh Circuit has dealt with Alabama's post-foreclosure sale, one year statutory right of redemption in *Commercial Federal Mtg. Corp. v. Smith (In re Smith)*, 85 F.3d 1555 (11th Cir.1996), as a property interest within 11 U.S.C. § 541(a)'s property of the estate. However and just like Alabama's statutory redemption post-foreclosure, this equitable antiforfeiture remedy may not be modified via 11 U.S.C. § 365(b)'s cure provision after a lease/leasehold estate has been ended pre-bankruptcy under state law. Rather, performance is to be in accord with Alabama's requirements of tender plus the more factors.

#### (4) *The Residual of the Litany*

##### (a) *No Writ of Restitution or Other Final Order*

As another part of their justifications for why the leases in question are assuma-

---

**32.** *In re Burke*, 76 F.Supp. 5 (S.D.Cal.1948), dealt with one of California's statutory provisions for relief from forfeiture, Cal. Civ.Code § 1179, which it held permitted relief when the forfeiture was based on more than just non-payment of rent. The *Burke* court also referenced Cal. Civ.Code § 1174, which applied to cases where the sole basis of forfeiture was nonpayment of rent. Section 1174 allows relief from forfeiture without notice to the lessor upon payment of the accrued unpaid rent. *In re Burke*, 76 F.Supp. at 8. Under this other statute, the "more" factor is not required.

ble, Moore and Daniels have a litany of other reasons, some legal, some not. One warranting supplemental comments is that a lease may not be ended in Alabama before entry of a writ of restitution or other court order. Although the discussion of lease terminations under Alabama's laws dispatches any debate over whether a lease may be earlier terminated by the giving of either a contractually allowed notice of termination or the statutory one, Daniels and Moore have paraphrased the legal support proffered in *Morgan* and argue that Alabama does not allow termination of a lease until execution of a writ of restitution in an unlawful detainer suit. This *Morgan* postulated argument is partially founded on a comparison to Louisiana law as interpreted by the United States Court of Appeals for the Fifth Circuit in *In re Fontainebleau Hotel,* 515 F.2d 913 (5th Cir.1975), and the contention that Louisiana law on lease terminations for nonpayment of rent is identical to Alabama's. As a result, it is urged that the same reasoning the Fifth Circuit utilized in *Fontainebleau Hotel* for why leases are not extinguishable until entry of a court order terminating a lease of nonresidential real property is applicable to Alabama terminations of leases of residential real property.

There are several reasons why this is not the case. Foremost in authority is the previously discussed Alabama statutory and case law to the contrary. Second, the *Fontainebleau Hotel* court expressly held that the lease it was considering had, as a matter of Louisiana law, *not* been terminated pre-bankruptcy. *Fontainebleau Hotel,* 515 F.2d at 914. This is precisely the opposite of the facts and law involving Moore and Daniels.

■ Another poignant factor for why the law of Alabama is contrary to that contended by Moore and Daniels is that Alabama's statutes governing lease terminations clearly recognize the lessor's re-entry or obtaining possession short of use of judicial proceedings. Ala.Code § 35–9–6 (1991)'s form notice of termination contains a demand that the lessee "quit and deliver up" the leased premises within the time stated in the notice. This statutory provision therefore contemplates a voluntary surrender of the leased premises without redress to an unlawful detainer or other legal proceeding to retake the leased property. Also, Alabama's courts have upheld the self help right of a landlord to, so long as done peacefully, re-enter or take back the leased premises where the contract grants a right of re-entry. *Moriarty,* 435 So.2d at 36–37; *Princess Amusement Co.,* 174 Ala. at 342, 56 So. at 980. These recognized means for retaking of leased premises following termination of a lease evidence that under Alabama's laws no final judgment or writ of restitution in an unlawful detainer or similar court proceeding is required for either a landlord's ending of a lease or retaking of possession of the leased property.

■ A further difficulty with the proposition that in Alabama a lease is not terminated and the possessory rights thereunder ended until either entry or execution of a writ of restitution or similar order is revealed by consideration of the precondition to commencement of an unlawful detainer suit. Alabama Code § 6–6–310's language is:

> For the purposes of this article, the following terms shall have the meanings respectively ascribed to them by this section:
>
> * * * * * *
>
> (2) UNLAWFUL DETAINER. Where one who has lawfully entered into possession of lands as tenant fails or refuses, *after the termination of the pos-*

*sessory interest of the tenant,* to deliver possession of the premises to anyone lawfully entitled or his or her agent or attorney.

Ala.Code § 6–6–310 (1996) (emphasis added). As a precondition to the bringing of an unlawful detainer suit, this statute expressly requires that the lease and a tenant's possessory rights under the lease be already ended. Alabama's courts have found no difficulty interpreting this section and its identical predecessor provisions in this way. See, e.g., *Kennamer Shopping Center,* 571 So.2d at 300; *Speer v. Smoot,* 156 Ala. 456, 457, 47 So. 256 (1908); *Ross v. Gray Eagle Coal Co.,* 155 Ala. 250, 46 So. 564, 565 (1908); *Myles,* 226 Ala. at 50, 145 So. at 314. Thus, the unequivocal requirement of Ala.Code § 6–6–310 (1996) of prior termination of a lease before bringing an unlawful detainer action reveals the invalidity of the Moore–Daniels argument that a lease may not be ended by a properly given notice of termination under a contract's terms or by Alabama's statutory methods. Rather, the antithesis is the law of Alabama.

(b) *Policy—Reorganization vs. Others*

By citation to case law on which they rely, Daniels and Moore make yet one more argument in support of their espoused belief regarding the existence of a lease on each's filing of bankruptcy. It is predicated on the asserted reorganization policy underlying a Chapter 13 bankruptcy case, and it, too, relies on an analogy to the decision in *In re Fontainebleau Hotel Corp.,* 515 F.2d 913 (5th Cir.1975), which involved a sublease of a hotel property by a Chapter X debtor under the Bankruptcy Act of 1898, as amended. The policy basis asserted by Daniels's and Moore's bankruptcy case law authorities is that Chapter 13 is designed to allow debtors a fresh start while paying some or all of his/her debts. This case law recognizes that most

Chapter 13 cases involve fewer creditors and smaller debts than reorganizations under Chapter 11 of the Bankruptcy Code or similar restructuring of debts under Chapters X and XI of the Bankruptcy Act. Based on the contended identity of policy considerations, equality of importance of these issues between Chapter 13 cases and the reorganization goals of the lineal predecessor provisions to Chapter 11, Chapters X and XI of the Bankruptcy Act, Daniels, Moore, and one of their cited authority, *Morgan,* point to *Fontainebleau Hotel* as support for the proposition that even if a lease was terminated before a debtor's filing of bankruptcy, it remains assumable. Knowing why this policy based, *Fontainebleau Hotel* analogy argument is incorrect necessitates review of the progenitors on which its holding rests and analysis of the facts of *Fontainebleau Hotel.*

First, the perimeters of *Fontainebleau Hotel.* It involved the asserted ending of Fontainebleau Hotel Corporation's sublease for a hotel in New Orleans, Louisiana. The reason given for termination was a default in payment of rent. The sublease provided for termination for nonpayment of rent by giving five days notice of intention to terminate. The agreement made termination effective on the running of the five day period. On July 24, 1974, the sublessor gave notice of default and termination to Fontainebleau Hotel Corporation. On August 1, 1974, following expiration of the five day notice period, Fontainebleau Hotel Corporation filed its bankruptcy petition under Chapter X of the Bankruptcy Act. *Fontainebleau Hotel,* 515 F.2d at 914. In value, the sublease was substantially all, if not all, of Fontainebleau Hotel Corporation's assets and its sole source of revenue. Loss of the sublease meant the elimination of any ability to reorganize as an operating business un-

der Chapter X. Given this background, the Fifth Circuit upheld the lower court's (i) determination that the sublease was a property interest which passed to the Chapter X trustee and was an asset utilizable as part of a Chapter X restructuring and (ii) refusal to declare the sublease forfeited. The affirmance of the lower court's actions was premised on two factors.

The court's initial consideration was whether the sublease had been terminated before the Chapter X case was filed. Only if it found the sublease had not been ended pre-bankruptcy did the Fifth Circuit's panel need to consider whether the lower court was right in not allowing termination of the sublease. Why it first ruled on the termination issue is important to bear in mind in the context of this Daniels–Moore matter: it need not have considered the post-petition termination/forfeiture issue if the lease had been ended pre-bankruptcy.

The *Fontainebleau Hotel* opinion's wording is explicit regarding the reason why, despite a contract provision to the contrary, the sublease had not been terminated pre-bankruptcy:

> We are unable to agree with this contention [that the sublease had terminated prior to filing of the bankruptcy]. The law of Louisiana requires legal proceedings against a delinquent lessee and a judgment of the proper court before possession may be obtained. *This cancellation of the lease for nonpayment of rent is not effective until a court has ordered termination and granted possession.* See *Edwards v. Standard Oil Co. of Louisiana,* 175 La. 720, 144 So. 430 (1932); *LeMoine v. Devillier,* La. App., 3 Cir., 189 So.2d 694 (1966); *Louisiana Materials Co. v. Cronvich,* La. App., 4 Cir., 236 So.2d 510 (1970). No judicial proceedings having been instituted in this case prior to the filing of the petition for corporate reorganization, the trustee succeeded to the possession of the debtor upon his appointment by the district court.

*Fontainebleau Hotel,* 515 F.2d at 914 (emphasis supplied).

In other words, and regardless of whether this Court believes the Fifth Circuit's holding was a correct one under Louisiana's laws, the Fifth Circuit panel held that the laws of Louisiana in 1974 did not permit termination of a lease for nonpayment of rent without a court order to that effect. This being the Fifth Circuit panel's holding on Louisiana law, Fontainebleau Hotel Corporation's sublease of the hotel property had not been ended pre-bankruptcy. This is the opposite of what is represented by Daniels and Moore and authorities cited by them regarding whether Fontainebleau Hotel Corporation's sublease had been terminated pre-bankruptcy. For this reason, the argument and the cases cited which use *Fontainebleau Hotel* as support for a pre-bankruptcy terminated lease being assumable under the Bankruptcy Code has a foundation based on an erroneous view of the holding in *Fontainebleau Hotel.* This, however, is not the only rationale for why the policy based argument of Daniels and Moore founded on *Fontainebleau Hotel* does not lend support for assumption of leases which have been ended before the filing of a bankruptcy case.

The other logic of a bankruptcy policy regarding debt repayment given in *Fontainebleau Hotel* as the basis for not allowing the post-bankruptcy termination/forfeiture of its hotel sublease does not exist in the Chapter 13 case of either Daniels or that of Moore. Understanding why requires retrogression to the 1946 decision of the Supreme Court of the United States in *Smith v. Hoboken R.R. Warehouse & S.S. Connect. Co.,* 328 U.S. 123, 66 S.Ct. 947, 90

L.Ed. 1123 (1946), and the other, later decisions of Courts of Appeals of the United States adopting the *Hoboken Railroad* court's holding's rationale in whole or in part, *In the Matter of Fleetwood Motel Corp.*, 335 F.2d 857 (3d Cir.1964); *Weaver v. Hutson,* 459 F.2d 741 (4th Cir.1972); *In the Matter of Queens Boulevard Wine & Liquor Corp. v. Blum,* 503 F.2d 202 (2d Cir.1974).

Unlike § 365(e) of the Bankruptcy Code, 11 U.S.C. § 365(e) (2002), which makes bankruptcy and insolvency clauses in contracts unenforceable in a bankruptcy case,[33] § 70b of the Bankruptcy Act, formerly 11 U.S.C. § 110(b) (reproduced in A *Collier on Bankruptcy,* App.Pt. 3–73 –74 (15th ed.1996)), called for enforcement in a bankruptcy case of

> ... an express covenant that an assignment by operation of law or the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same....

*Finn v. Meighan,* 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945). The same sorts of bankruptcy/insolvency provisions in leases were also enforced in receiverships and insolvency instances outside bankruptcy. See, e.g., *Model Dairy Co. v. Foltis–Fischer, Inc.,* 67 F.2d 704, 705–06 (2d Cir.1933). Within a year of its *Finn* holding that the § 70b bankruptcy/insolvency clause provision was applicable in Chapter X reorganization cases, the Supreme Court in *Smith v. Hoboken R.R.* determined that such a lease provision should not be enforced. *Hoboken Railroad,* 328 U.S. 123, 66 S.Ct. 947.

*Hoboken Railroad* involved the termination of a 99 year lease of a terminal switching railroad. Note should be taken of the fact that *Hoboken Railroad* entailed the post-bankruptcy termination of a lease under a bankruptcy/insolvency provision of the lease. Of necessity, this means the lease was property which passed to the trustee under § 70a(5) of the Bankruptcy Act, formerly 11 U.S.C. § 110(a)(5) (reproduced in A *Collier on Bankruptcy,* App.Pt. 3–72 (15th ed.1996)), on the commencement of Hoboken Railroad's bankruptcy.

The Supreme Court's (i) reversing of the Court of Appeal's ruling allowing the lessor to terminate the lease, and (ii) refusing to allow termination of the lease under the bankruptcy/insolvency clause was predicated on (1) the lease not being terminable by the lower courts because such an action required approval by the governmental agency with primary responsibility over railroads, the Interstate Commerce Commission ("ICC"), (2) the "public interest, as distinguished from private [which] bulks large in the problem, the solution [which] is largely a function of the legislative and administrative agencies of government ...", (3) the railroad's reorganization being the primary responsibility of the Interstate Commerce Commission "... subject to a degree of participation by the [bankruptcy] court", (4) the termination/forfeiture depriving the reorganizing debtor of all of its railroad properties, and (5) the termination/forfeiture of the lease in a bankruptcy case in advance of consideration of such a termination by the Interstate Commerce Commission interfering with the functions granted to the ICC under § 77 of the Bankruptcy Act, i.e., primary entrustment of the nature of the plan of reorganization to the ICC. See

---

**33.** Generally, these are provisions which allow termination of a lease on the filing of bankruptcy, whether voluntary or involuntary, appointment of a receiver or trustee, commencement of receivership proceedings, or assignments/arrangements for the benefit of creditors.

*Hoboken Railroad,* 328 U.S. at 130–33, 66 S.Ct. at 951–53.

The Supreme Court noted that the lease held by *Hoboken Railroad's* trustee could not be terminated under the Interstate Commerce Act without prior ICC approval. This is where the public interest arises: the ICC in formulating a plan that would comport with the bankruptcy law requirements of one which is "... fair and equitable and feasible ..." must also present one which would be "... compatible with the public interest" of the ICC development and maintenance of an adequate transportation system. *Hoboken Railroad,* 328 U.S. at 131, 66 S.Ct. at 952. The "public interest" referred to was that of a national railroad system and whether the railroad terminal switching operations subject to the lease should be kept in force *and* by which entity, the debtor or some other entity, should such operations be continued. It was *not* the bankruptcy related interests of the reorganizing debtor or its creditors. Most specifically revealed in *Hoboken Railroad* is that the public interest was not one arising from the Bankruptcy Act or any related bankruptcy laws! *Hoboken Railroad,* 328 U.S. at 131, 66 S.Ct. at 952 (stating: "The Commission in preparation of the plan is guided not only by the requirements that the plan be fair and equitable and feasible. It is also charged with the duty of preparing a plan that 'will be compatible with the public interest.' § 77(d). Whether a leased line should continue to be operated by the lessee or should revert to the system of the lessor may present large questions bearing on the development by the Commission of an adequate transportation system. Interstate Commerce Act § 1."); see also *In the Matter of D.H. Overmyer Co., Inc.,* 510 F.2d 329, 332 (2d Cir.1975).

The *Hoboken Railroad* holding may be summarized as preventing a *post-bank-ruptcy* termination of a lease when an important national interest (adequate transportation facilities) is involved, the leased property is property without which a reorganization is not obtainable and where a termination of a lease under the bankruptcy statute would frustrate the goals and purposes of the statute giving primary responsibility for such a determination to another governmental entity, the ICC. By far the most important fact of *Hoboken Railroad* is that its holding was premised on the railroad switching lease *not having been ended, or terminated* before Hoboken Railroad's bankruptcy case was filed. This is the exact opposite of what happened with the Daniels lease and the Moore lease.

Just shy of thirty years after the *Hoboken Railroad* decision, the Third Circuit in *In the Matter of Fleetwood Motel Corp.,* 335 F.2d 857 (3d Cir.1964), utilized the *Hoboken Railroad* holding in refusing to allow the *post-bankruptcy termination* of a lease involving what was initially vacant land located in Atlantic City, New Jersey, on which the debtor had constructed a motel at a cost of over $1,274,000.00, with a book value, exclusive of the land, of approximately $1,400,000.00. *Fleetwood Motel,* 335 F.2d at 860. The basis on which the lessor sought termination of the lease was nonpayment of rent. Under the lease termination provisions, the ending of the lease would have resulted in the land plus all improvements going to the lessor. In this instance, the lessor would receive back the leasehold property with a very significant increase in its value. The leased property plus improvements were the sole assets of the debtor and its only sources of revenue.

To finance, in part, the construction of the motel, Fleetwood made a public offering of stock and debentures which in the aggregate exceeded $570,000.00. *Fleet-*

*wood Motel,* 335 F.2d at 860. A party which had significant statutory involvement regarding the Chapter X plan in *Fleetwood Motel* was the Securities and Exchange Commission. Fleetwood was given notice of termination for nonpayment of rent on September 17, 1960, which under the lease was to be effective fifteen days later. Ten days after this notice, September 27, 1960, Fleetwood's Chapter X case was filed. *Fleetwood Motel,* 335 F.2d at 861. This lease also contained a bankruptcy/insolvency clause providing for termination of the lease on the occurrence of the filing of a bankruptcy case by or against Fleetwood or in the event of its insolvency.

In reliance on *Hoboken Railroad* and in a case with strikingly similar facts, the Third Circuit denied the lessor's use of the bankruptcy/insolvency clause to terminate the lease post-bankruptcy.[34] Similar to what occurred in *Hoboken Railroad,* the Third Circuit rested its holding on (1) the public interest of the shareholders and debenture holders represented by a governmental agency with responsibilities regarding a reorganization plan, the SEC, involving another federal statute, the Securities Exchange Act of 1934, giving primary governance of such securities matters to the SEC, (2) the leased property plus improvements being the only asset of and the sole source of revenues for the debtor and, therefore, involving a case where reorganization was impossible without the leased property, (3) the determination that New Jersey law would not allow a forfeiture, e.g., the ending by termination, of the lease under the facts, and (4) the allowance of forfeiture resulting in a windfall to the lessor which would be un-conscionable. See *Fleetwood Motel,* 335 F.2d 857 (3rd Cir.1964). As with *Hoboken Railroad,* the court viewed a public interest to be involved and that interest was not that of the debtor or its trade creditors involved in the bankruptcy case. More straightforwardly, it was not any public policy inherent in the bankruptcy laws. Rather, it was as in *Hoboken Railroad* a different type of "public interest" which was the basis for the *Fleetwood Motel* holding. It involved giving deference to and not precluding the governmental agency with reorganization plan input responsibilities along with compliance with its duties under federal securities laws. It also involved the critical and only asset upon which a business reorganization could be accomplished. Just as relevant is that *Fleetwood Motel* was a dispute over post-bankruptcy termination of the lease in question. Once, again, this is not the lease termination status of the Moore–Daniels disputes.

Two other decisions on the United States Court of Appeals level which did not enforce insolvency/bankruptcy clauses followed *Fleetwood Motel* and preceded *Fontainebleau Hotel: Weaver v. Hutson,* 459 F.2d 741 (4th Cir.1972) and *Queens Blvd. Wine & Liquor Corp. v. Blum,* 503 F.2d 202 (2d Cir.1974).

Both *Weaver* and *Queens Boulevard* have common features to those used in Hoboken Railroad, Fleetwood Motel, and *Fontainebleau Hotel* to justify not terminating the respective leases at issue. One is that the *Weaver* and *Queens Boulevard* lessors sought to end the leases under a bankruptcy/insolvency clause. *Weaver,* 459 F.2d at 743; *Queens Boulevard,* 503 F.2d 202. The property leased in *Weaver*

---

**34.** It appears that following the bankruptcy filing the lessor in *Fleetwood Motel* did not, on appeal, pursue the issue of the validity of its pre-bankruptcy notice of termination for non-payment of rent. Rather, what went forward was consideration of the request to terminate based on the bankruptcy/insolvency clause.

was a motel built by the lessee on land of the lessor at a construction cost of well over one million dollars and the aggregate value of the land, motel, fixtures, equipment, and furniture of approximately two million dollars. It comprised the overwhelming value of the bankruptcy estate and was the sole source of income. In *Queens Boulevard*, the leased property was the sole liquor store location of the debtor without which it had no place to operate its liquor sales business and absent the location no source of generating operating income. Thus, both *Weaver* and *Queens Boulevard* were instances where a single property was leased which was in value and for revenue generation the asset without which no plan of business reorganization was possible. *Weaver*, as *Fleetwood Motel*, was a case where termination of the lease resulted in return of leased property to the lessor with well over one million dollars in improvements which both the *Weaver* and *Fleetwood Motel* courts viewed as unconscionable and inequitable. *Weaver*, 459 F.2d 741; *Fleetwood Motel*, 335 F.2d 857. Each of the courts in *Weaver* and *Queens Boulevard* determined that absent the only property upon which reorganization could be achieved that termination of the leaseholds post-bankruptcy would, as stated in *Weaver*, emasculate the reorganization process or, as concluded in

*Queens Boulevard*, would be inimical to the reorganization process. *Weaver*, 459 F.2d 741; *Queens Boulevard*, 503 F.2d 202. One further identity exists between *Weaver* and *Queens Boulevard:* both courts determined that the lessor had waived and/or was estopped from utilizing the pre-petition breaches asserted as a basis for ending the respective leases. *Weaver*, 459 F.2d 741; *Queens Boulevard*, 503 F.2d 202. The result is that each court actually held that an asserted pre-bankruptcy termination of the leases in question did not occur based on application of the laws of the applicable states regarding forfeitures. Therefore, *Weaver* and *Queens Boulevard* [35] follow the consistent requirement forming the basis for the holdings in *Hoboken Railroad* and *Fleetwood Motel*—which was later followed in *Fontainebleau Hotel*—that no lease termination occurred before the bankruptcy case was filed.

For purposes of these Daniels–Moore–Farrington Apartments matters, the Hoboken Railroad–*Fleetwood Motel*–*Weaver*–*Queens Boulevard*–*Fontainebleau Hotel* case law support for not allowing termination of a lease have a constancy of factors which do not exist in either the Daniels case or that of Moore. First, they involved whether a lease should be allowed to be terminated post-bankruptcy. Such is

---

**35.** In *In re D.H. Overmyer Co., Inc.,* 510 F.2d 329, 332 (2nd Cir.1975), the Second Circuit recognized the public interest required by the Supreme Court in *Hoboken Railroad* was that relating to railroads' successful operations. It then admits in *Queens Boulevard*, "[e]xtend[ed] the holding in *Smith [v. Hoboken Railroad]* ... [by holding] in *Queens Boulevard* that a bankruptcy court may exercise its equitable discretion to deny enforcement of a termination clause...." Somewhat different from *Queens Boulevard*, the *Weaver* court predicated its opinion expressly on *Hoboken Railroad* and *Fleetwood Motel*. *Weaver*, 459 F.2d at 744. However, in the addendum to its *Weaver* opinion denying rehearing *en banc*,

the Fourth Circuit expressly applied the principle that "as a court of equity the bankruptcy court had the discretion and power to refuse enforcement ..." of the insolvency/bankruptcy termination clause. *Weaver*, 459 F.2d at 744–45. Closer scrutiny of *Weaver* reveals that it predicated the refusal to allow post-bankruptcy termination on the underlying state law, North Carolina's, of waiver by a lessor who continues to accept rent after a default. As a result and unlike *Queens Boulevard*, the *Weaver* reference to equity principles was in the context of established state law which prevented the lease at issue from having been ended.

not the state of affairs in these matters. Second, each involved the only property of sufficient value and the only source from which income could be obtained to be able to reorganize. Once more, Daniels and Moore had leases for property constituting their residence which has no intrinsic value in the sense that it is a business asset from which income is generated. Since this case does not involve any determination of Daniels's or Moore's continued entitlement to HUD rental subsidies, no argument regarding the loss of such a subsidy exists in these cases for stay relief regarding their formerly leased premises. As significant as these are, the fact that the only creditor in Daniels's case is Farrington Apartments and Moore's Chapter 13 Plan provides for payment for only unsecured debt which is overwhelmingly comprised of the Farrington Apartments obligation. Third, and with the exception of *Fontainebleau Hotel* and *Queens Boulevard,* the public interest factor required by the *Hoboken Railroad* analysis which was present in other of the *Hoboken Railroad* progeny was something more than the reorganization aspects of a bankruptcy and payment of creditors. This, too, is absent in the Daniels and Moore cases.

Although it is evident that *Fontainebleau Hotel* and *Queens Boulevard* expanded the Supreme Court's *Hoboken Railroad* holding by eliminating its non-bankruptcy related public interest finding, these courts' avoidance of this aspect of *Hoboken Railroad* and the Bankruptcy Act's specific recognition of insolvency/bankruptcy clauses was grounded in material part on the use of general equity powers of a federal court. This the Second Circuit admits in its later *Overmyer* opinion. *D.H. Overmyer Co., Inc.,* 510 F.2d at 332.

As for the Fifth Circuit, *Fontainebleau Hotel,* 515 F.2d at 914, has this language:

It is within the equity power of the district court, under the circumstances here, to decline [post-bankruptcy] forfeiture of the lease ...

The *Fontainebleau Hotel* opinion also evidences the Fifth Circuit's reliance on *Queens Boulevard* by adopting its expansion of *Hoboken Railroad* without complying with the type of public interest the *Hoboken Railroad* court found as an important basis for its holding. *Fontainebleau Hotel,* 515 F.2d at 914–15.

To the extent that the holdings in *Fontainebleau Hotel* and *Queens Boulevard* used federal equity principles to avoid a provision of the Bankruptcy Act regarding insolvency/bankruptcy clauses, this legal basis is precisely what *Butner* was about and was rejected by the Supreme Court within a few short years after the *Fontainebleau Hotel* and *Queens Boulevard* decisions. The Supreme Court set forth in *Butner v. U.S.,* 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 142 (1979), that "... undefined considerations of equity provide no basis for adoption of a uniform rule affording mortgagees an automatic interest in the rents as soon as the mortgagor is declared bankrupt." Thus, whatever vitality as legal precedent *Fontainebleau Hotel* and *Queens Boulevard* may have had before *Butner,* it lost it for its use of such equity powers by a federal court to overcome what a national law of bankruptcy necessitates.

Lastly for the *Fontainebleau Hotel* reorganization based policy arguments and with the enactment of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* the enforceability of insolvency/bankruptcy clauses as had been mandated by § 70(b) of the Bankruptcy Act was eliminated by § 365(b)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 365(b)(2)(A). All of these reasons are sufficient for why *Fontainebleau Hotel* and its predecessor authority are

inapplicable in a nonbusiness Chapter 13 case such as that of Daniels and of Moore. Accordingly, this Court rejects each as a defense to Farrington Apartments's request for relief from the automatic stay imposed under § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

### VI. *The Reconstruction–A.K.A. § 541, not § 365, Controls Property of the Estate*

Just as interests in real property are diverse and range from fee simple to life estates, to remainder and reversionary interests, to leaseholds, licenses, and a multitude of others constituting less than the whole, divergent approaches exist with respect to analyzing and deciding matters involving bankruptcy laws. Some may be determined solely by reference to what may be considered the whole, that is by reference to only the national law of bankruptcy. By way of contrast, others must be decided by application of a part of one body of law, state law, with the national one. For those where the breakup of the legal analysis is into parts composed of application of state law with federal law, sometimes the state law founded determination on which a federal law based decision is predicated forms a seamless union for resolution of the legal issue. Other times, the utilization of one to make a decision under the other is less than harmonious. This memorandum opinion contains this Court's foray into which of the divergent positions of federal courts is the proper application of state law with bankruptcy law governing lessor requests for modification of the automatic stay under § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), and lessee defenses premised on the argued assumability of allegedly unexpired leases under § 365(a) & (d)(2) of the Bankruptcy Code, 11 U.S.C. § 365(a) & (d)(2). The common thread in each is that the asserted unexpired lease is a pre-bankruptcy terminated lease of residential real property.

A review of the decisions of courts which have considered whether a residential lease of real property terminated prior to a debtor filing his or her bankruptcy petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 1301 *et seq.*, is unexpired reveals that they frequently are decided in the context of either modification of the automatic stay and/or the assumption of an asserted executory contract or unexpired lease. See *In re Williams,* 144 F.3d 544 (7th Cir.1998); *Robinson v. Chicago Housing Authority (In re Robinson),* 54 F.3d 316 (7th Cir.1995); *Ross v. Metropolitan Dade County (In re Ross),* 142 B.R. 1013 (S.D.Fla.1992); *In re Atkins,* 237 B.R. 816 (Bankr.M.D.Fla.1999); *In re DiCamillo,* 206 B.R. 64 (Bankr.D.N.J.1997); *In re Mims,* 195 B.R. 472 (Bankr.W.D.Okla. 1996); *In re Morgan,* 181 B.R. 579 (Bankr. N.D.Ala.1994); *In re Smith,* 105 B.R. 50 (Bankr.C.D.Cal.1989); *In re Yardley,* 77 B.R. 643 (Bankr.M.D.Tenn.1987); *In re Talley,* 69 B.R. 219 (Bankr.M.D.Tenn. 1986); *In re Depoy,* 29 B.R. 466 (Bankr. N.D.Ind.1983); *In re Darwin,* 22 B.R. 259 (Bankr.E.D.N.Y.1982); *Executive Square Office Building v. O'Connor and Associates, Inc.,* 19 B.R. 143 (Bankr.N.D.Fla. 1981); *In re Lewis,* 15 B.R. 643 (Bankr. E.D.Pa.1981). Further study of such decisions allows one to segregate them into those which give primacy to § 541 of the Bankruptcy Code, 11 U.S.C. § 541, for the determination of what is property of the estate by coordination with state law for property interests held by a debtor, see, e.g., *In re Williams,* 144 F.3d 544 (7th Cir.1998); *In re Caldwell,* 174 B.R. 650 (Bankr.N.D.Ga.1994); *In re Smith,* 105 B.R. 50 (Bankr.C.D.Cal.1989); *In re Depoy,* 29 B.R. 466 (Bankr.N.D.Ind.1983); *In re Darwin,* 22 B.R. 259 (Bankr.E.D.N.Y. 1982); *In re Lewis,* 15 B.R. 643 (Bankr. E.D.Pa.1981), while others utilize § 365 of

the Bankruptcy Code, 11 U.S.C. § 365, as a separate and distinct portion of the Bankruptcy Code along with one or more of 11 U.S.C. § 362(b)(10) and 11 U.S.C. § 541(b)(2) and the other parts of the deconstruction methodologies to overcome state law on property interests under a centralistic view of the Bankruptcy Code for what the scope of property of the estate is as of the moment one files a bankruptcy case, see, e.g., *In re Robinson v. Chicago Housing Authority*, 54 F.3d 316 (7th Cir.1995) (Although rejects argument that terminated is not unexpired, placed here due to the adoption of *Talley* and *Ross* generalized rule that loss of possession governs ending of lease); *In re Ross*, 142 B.R. 1013 (S.D.Fla.1992); *In re Atkins*, 237 B.R. 816 (Bankr.M.D.Fla.1999); *In re DiCamillo*, 206 B.R. 64 (Bankr. D.N.J.1997); *In re Mims*, 195 B.R. 472 (Bankr.W.D.Okla.1996); *In re Morgan*, 181 B.R. 579 (Bankr.N.D.Ala.1994); *In re Yardley*, 77 B.R. 643 (Bankr.M.D.Tenn. 1987); *In re Talley*, 69 B.R. 219 (Bankr. M.D.Tenn.1986); *Executive Square Office Building v. O'Connor and Associates, Inc.*, 19 B.R. 143 (Bankr.N.D.Fla.1981). Although this bifurcation of cases is simple in concept, it poignantly reveals the departure of those which utilize linguistic and maxim based interpretations of one or more of 11 U.S.C. §§ 362(b)(10), 365(c)(3) & (d)(2), & 541(b)(2), the flawed *Glenn* foreclosure analogy, and misapplication of antiforfeiture remedies to determine what interests a debtor has which are property of his or her estate in a bankruptcy case in lieu of the analytical approach which was posited by the Supreme Court of the United States in *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

As part of this Court's analysis of whether one or more methods is appropriate to deviate from the *Butner* called for approach for ascertaining property of a debtor's bankruptcy estate, this Court has looked to Alabama law to locate how it treats the ending of residential leases and leasehold estates such as those which used to exist between Farrington Apartments and Ms. Daniels and the other one between it and Ms. Moore. This review and analysis has demonstrated that Alabama's statutes are not susceptible of linguistic indeterminancy or in need of use of maxims of statutory interpretation for determining how and when the landlord-tenant relationship is ended in Alabama. For Daniels and Moore, each's lease with Farrington Apartments was ended before the start of the respective bankruptcy cases and neither is entitled to relief from prebankruptcy forfeiture under Alabama's equitable case law.

The next facet considered is what has been categorized as The Deconstructionism where three groupings of legal arguments are described and evaluated for whether what is a centralistic approach to application of national bankruptcy laws may be implemented to overcome what *Butner, et al.* hold is to be resolved, absent some federal interest mandating a different result, in a federalistic manner. This Court's inquiry has rejected in the cases before it each of the three deconstruction methodologies: use of the plain meaning rule and variations of the statutory interpretation maxim of excluding one evidences inclusion of another, the *Glenn* mortgage foreclosure analogy argument, and the application of post-lease ending antiforfeiture remedies absent proof that a debtor has, post lease ending, complied with what state law mandates for such relief: full payment of the accrued, unpaid rent plus damages and the existence of other factors, such as unjust enrichment and unconscionable results.

Finally, the residual arguments of the litany presented to this court predicated on the argued applicability of the law and

policy recited in *Fontainebleau Hotel* has been scrutinized and discarded. This is because (i) the state law cited in *Fontainebleau Hotel* is that of Louisiana and a comparison of how the Fifth Circuit interpreted Louisiana's lease ending law with what Alabama's allows demonstrates that it is different from that of Alabama governing lease-leasehold endings, (ii) the federal law utilized has been discredited by later precedent of the Supreme Court and adoption of a newer law of bankruptcy, the Bankruptcy Code, and (iii) the major factual variance from the cases before this Court of the lease not having been terminated pre-bankruptcy in *Fontainebleau Hotel.*

■ The inescapable conclusion is that both the Daniels and the Moore landlord-tenant relationships with Farrington Apartments were ended before and did not exist as of the date of their respective bankruptcy filings as interests in property under Alabama law. This precludes both terminated leases and leasehold estates from being property of the estate for 11 U.S.C. §§ 541(a) & 1306(a) purposes. Not being property of the estate means that neither may be unexpired leases within the perimeters of 11 U.S.C. § 365(a) & (d)(2). This ruling recognizes § 541 of the Bankruptcy Code, 11 U.S.C. § 541, as the section controlling over 11 U.S.C. § 365 for whether a pre-bankruptcy terminated residential real property lease is property of a Chapter 13 debtor's bankruptcy estate. It is the federalistic approach, not one which is centralistic, which is the underpinning for this determination. Accordingly and absent any further post-bankruptcy agreement between the contending parties sufficient to alter the outcome determined by this Court, the requests of Farrington Apartments to modify the automatic stay of 11 U.S.C. § 362(a) are to be granted

under the terms of a separate order incorporating this memorandum opinion.